**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JAY MIDDLETON, individually and on behalf of the AMENTUM 401(K) RETIREMENT PLAN and DYNCORP INTERNATIONAL SAVINGS PLAN, and all others similarly situated, *Plaintiff*, v. AMENTUM GOVERNMENT SERVICES PARENT HOLDINGS LLC, AMENTUM BENEFITS ADMINISTRATION COMMITTEE, TAMMY WOODMAN, DYNCORP INTERNATIONAL LLC, THE RETIREMENT AND EMPLOYEE BENEFIT PLANS COMMITTEE, BARBARA WALKER, and JOHN AND JANE DOE DEFENDANTS 1-30, *Defendants*. | Case No. **CLASS ACTION COMPLAINT** |

**INTRODUCTION**

Plaintiff Jay Middleton, on behalf of the Amentum 401(k) Retirement Plan (the "Amentum Plan") and the DynCorp International Savings Plan (the "DynCorp Plan") (collectively, the "Plans"), himself, and all others similarly situated, bring this class action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against the fiduciaries of the Amentum Plan and the fiduciaries of the DynCorp Plan (which merged into the Amentum Plan effective December 31, 2021), for breaches of their fiduciary and other duties. The liable fiduciaries include Amentum Government Services Parent Holdings LLC and the Amentum Benefits Administration Committee; DynCorp International LLC and The Retirement and Employee Benefit Plans Committee (of the DynCorp Plan); and individual members of the committees, including Tammy Woodman, Barbara Walker, and John and Jane Does 1–30 (collectively "Defendants").

1

Plaintiff brings this action by and through his undersigned attorneys based upon personal knowledge, information contained in the Plans' publicly available Form 5500 series filings with the United States Department of Labor, the account information and statements provided to him as a participant in the Plans, and other information publicly available or obtained through counsel's preliminary investigation. Plaintiff anticipates that discovery will uncover further support for the allegations in this Complaint, and, potentially, for additional claims.

As described herein, Defendants have breached their fiduciary duties to Plaintiff, in violation of ERISA, to the detriment of the Amentum Plan, the DynCorp Plan, and the Plans' participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement going forward, and obtain equitable and other relief as provided by ERISA. Plaintiff requests this relief for the benefit of the Plans and their participants and beneficiaries.

In support of his claims, Plaintiff states and alleges as follows:

## NATURE OF THE CASE

1.      Plaintiff brings this case on behalf of the Amentum Plan and the DynCorp Plan, himself, and all persons who were and/or are participants in or beneficiaries of either or both the Amentum Plan and the DynCorp Plan and fall within the definition of the Class set forth herein, pursuant to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*

2.      Plaintiff brings this case against the Defendants, as fiduciaries of the Plans, for breaches of their fiduciary duties and for engaging in prohibited transactions during the Class Period (defined as the six-year period preceding the filing of the original Complaint in this case through the date of judgment).

3.      To protect plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(A)–(B). These fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

4.      Employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 2 (Sept. 2019) [hereinafter *A Look at 401(k) Plan Fees*], https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of services to the plan and investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7. Indeed, an employer has a specific obligation to consider the fees and expenses paid by [a] plan.

6.      "Cost-conscious management is fundamental to prudence in the investment function, and should be applied not only in making investments but also in monitoring and reviewing investments." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (internal quotations and citations omitted).

7.     Additional fees of only 0.18% or 0.4% can have a large impact on a participant's investment results over time because plan participants and beneficiaries "subject to higher fees . . . lose not only the money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Id.* (internal quotations and citations omitted).

8.     "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes v. Nw. Univ.*, 595 U.S. __, 142 S. Ct. 737, 738–39 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)). And, if the fiduciaries "fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id*. at 739.

9.     According to Morningstar's 2023 Retirement Plan Landscape Report, the Amentum Plan is a "Mega plan" because it has over $500 million in plan assets.

10.     Compared to other 401(k) plans, the Brightscope/ICI Defined Contribution Plan Profile report dated September 2022 (utilizing 2019 data) places the Amentum Plan within the top 0.2% of 401(k) plans based on plan assets (out of 603,217 total 401(k) plans).

11.     As of December 31, 2021, after the merger of the Amentum Plan and DynCorp Plan, the Amentum Plan held over $1.63 billion in assets.

12.     Pre-merger, the Amentum Plan held between $283,155,602 and $838,257,947 in assets during years 2017, 2018, 2019, and 2020.

13.     Pre-merger, the DynCorp Plan held between $398,348,318.00 and $547,565,337.00 in assets during years 2017, 2018, 2019, and 2020.

14.     According to the Brightscope/ICI Defined Contribution Plan Profile report dated September 2022 (using 2019 data), each plan would independently place within the top 0.5% of all 401(k) plans based on plan assets.

15.     As some of the largest 401k plans in the United States, the Plans had (and in the case of the Amentum Plan continues to have) substantial bargaining power regarding the fees, expenses, and costs charged against participants' investments.

16.     During the Class Period, Defendants, as fiduciaries of the Plans, breached the duties they owed to the Plans, to Plaintiff, and to other participants and beneficiaries of both plans by failing to adequately monitor and control fees, expenses, and costs, allowing service providers to charge excessive fees, expenses, and costs.

17.     Defendants' mismanagement of the Plans cost the Plans and their participants millions of dollars.

18.     Plaintiff brings this action to remedy the losses sustained as a result of Defendants' fiduciary breaches and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of ERISA.

19.      Plaintiff asserts claims against Defendants for breaching their fiduciary duties, as set forth below.

20.     This Complaint is based upon known facts and reasonable inferences drawn from the facts as set forth herein.

## THE PARTIES

### Plaintiff

21.     Plaintiff Jay Middleton resides in Overland Park, Kansas.

22.      Plaintiff was employed by DynCorp International LLC from 2003 to 2005 and participated in the DynCorp Plan.

23.      After ending his employment with DynCorp, Plaintiff remained a participant in the DynCorp Plan.

24.      When the DynCorp Plan and Amentum Plan merged effective December 31, 2021, Plaintiff's assets were transferred to the Amentum Plan.

25.      Since December 31, 2021, Plaintiff has been and remains a participant in the Amentum Plan.

26.      Plaintiff has standing to bring this action because he previously participated in the DynCorp Plan, he is a current participant in the Amentum Plan, and he was personally injured in fact as a result of Defendants' breaches of their fiduciary duties as alleged in more detail below. Those injuries include but are not limited to monetary injury from the imprudent investment options offered to Plaintiff by the DynCorp Plan and the Amentum Plan, the overarching process by which Defendants chose imprudent options for the Plan, the denial of the opportunity to invest in lower-cost alternative funds, and diminution of the value of Plaintiff's retirement assets.

**Defendants as Fiduciaries under ERISA**

27.      ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

28.      ERISA treats as fiduciaries not only persons expressly named as fiduciaries under 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

29.      Defendants are, or during the Class Period were, fiduciaries of the Plans under ERISA.

30.     Defendants are or were fiduciaries of the Plans because they were so named; they exercised authority or control respecting management or disposition of the Plans' assets; they exercised discretionary authority or discretionary control respecting management of the Plans; they had discretionary authority or discretionary responsibility in the administration of the Plans; and/or they acquired a fiduciary and thus its liability.

**The Corporate Defendants**

31.     Defendant Amentum Government Services Parent Holdings LLC ("Amentum") describes itself as a "premier leader in global engineering, project management, and solutions integration," and operates in 85 countries with 44,000 employees.[1]

32.     DynCorp International LLC ("DynCorp") was a provider of sophisticated aviation, logistics, training, intelligence and operational solutions in over 30 countries worldwide.[2]

33.     In November 2020, Amentum acquired DynCorp.

**Merger of the Plans**

34.     DynCorp was the sponsor and administrator of the DynCorp International Savings Plan (the "DynCorp Plan").

35.     Amentum is the sponsor and administrator of the Amentum 401(k) Retirement Plan (the "Amentum Plan").

36.     After Amentum's November 2020 acquisition of DynCorp, the Amentum Plan and DynCorp Plan were merged into a single plan.

---

[1] AMENTUM, *A Premier Leader in Global Engineering, Project Management, and Solutions Integration*, https://www.amentum.com/ (last visited July 17, 2023).

[2] AMENTUM, *Amentum Closes DynCorp International Acquisition*, https://www.amentum.com/2020/11/16/amentum-closes-dyncorp-acquisition/ (Nov. 16, 2020).

37.     The merger of the Amentum Plan and DynCorp became effective December 31, 2021.

38.     Through its acquisition of DynCorp, which served as the sponsor and administrator of the DynCorp Plan, Amentum is liable for DynCorp's breaches of the fiduciary duties owed to the DynCorp Plan and its participants and beneficiaries.

39.     DynCorp and its prior owners, officers and agents who were fiduciaries of the DynCorp Plan remain liable for any and all breaches of ERISA's fiduciary duties that occurred during the time DynCorp was the sponsor and/or administrator and they were fiduciaries of the DynCorp Plan.

**The Administrative Committee Defendants**

40.     DynCorp delegated responsibility for administering the DynCorp Plan to the Retirement and Employee Benefit Plans Committee, and that Committee had authority to and did appoint the individual members of the Committee.

41.     The DynCorp Plan's Retirement and Employee Benefit Plans Committee was responsible for administering the DynCorp Plan and selecting and retaining prudent investment options for plan participants.

42.     Amentum delegated responsibility for administering the Amentum Plan to the Defendant Amentum Benefits Administration Committee, and that Committee has authority to and did appoint the individual members of the Amentum Benefits Administration Committee.

43.     The Amentum Benefits Administration Committee was and is responsible for administering the Amentum Plan and selecting and retaining prudent investment options for plan participants.

44.     Upon information and belief, at some point between Amentum's November 2020 acquisition of DynCorp and the December 31, 2021 merger of the Amentum Plan and DynCorp Plan, DynCorp delegated responsibility for administering the DynCorp Plan to the Amentum Benefits Administration Committee, after which that Committee had the authority to and did appoint the individual members of the DynCorp Plan's Retirement and Employee Benefit Plans Committee and became responsible for administering the DynCorp Plan and selecting and retaining prudent investment options for plan participants..

**The Individual Defendants**

45.     Individual defendants Tammy Woodman and Barbara Dianne Walker were employees of DynCorp and among those who were appointed to serve on the DynCorp Plan's Retirement and Employee Benefit Plans Committee.[3]

46.     During her employment at DynCorp from October 2018 through November 2020, Woodman's job title was "401(k) & Compliance Principal."

47.     Following Amentum's November 2020 acquisition of DynCorp, Woodman became an employee of Amentum, where she held the same title, "401(k) & Compliance Principal,"  and was appointed to serve on the Amentum Benefits Administration Committee.

48.     Woodman signed the 2021 Form 5500s for both the DynCorp Plan and Amentum Plan as plan administrator.

---

[3] Plaintiff uses the committee name identified as the administrator for the DynCorp Plan in the DynCorp Plan's Form 5500s. In the event the Form 5500s misstate the name of the committee that serves as its administrator, the name used in this Complaint is intended and shall be deemed to refer to the DynCorp Plan's administrative committee by whatever other name(s) it is or has been known, including but not limited to the Retirement and Employee Benefit Plans Committee.

9

49.     Walker worked for DynCorp as Senior VP of Human Resources and a member of DynCorp's Board of Directors, but Plaintiff is unaware of the exact dates of her employment and service as a Director of DynCorp.

50.     Walker signed or is listed as plan administrator on the DynCorp Plan's Form 5500s for the following years: 2017, 2018, 2019, and 2020.

51.     Defendants John and Jane Does 1–30 are the as-of-yet-unidentified individuals who are or were members of the Amentum Benefits Administration Committee and/or the Retirement and Employee Benefit Plans Committee (for the DynCorp Plan), as well as the other officers, employees, contractors, entities, and/or agents of the corporate Defendants who were fiduciaries of either Plan during the Class Period or are or were responsible for administering either of the Plans at any time during the Class Period. This necessarily includes, but is not limited to, those persons who were fiduciaries of the DynCorp Plan during the time DynCorp International LLC served as the plan administrator. As such, defendants John and Jane Does 1–30 are or were the individuals or part of the group that was delegated control over the management of the Plans and their assets, including selecting and regularly monitoring the Plans' investment options and the performance and costs of those options, comparing them to other better-performing or less-costly alternatives, choosing and overseeing the Plans' third-party administrator, custodian, trustee, recordkeeper, and other service providers, and monitoring the compensation and minimizing the costs of such third-party services.

**Defendants' Citizenship and Service Information**

52.     Amentum is a privately held, Delaware limited liability company, headquartered in Chantilly, Virginia, and may be served through its registered agent, The Corporation Trust Company, at its registered office, Corporation Trust Center, 1209 Orange Street, Wilmington,

Delaware 19801. The Amentum Benefits Administration Committee may be served at this same address.

53.     DynCorp, a Delaware corporation with its headquarters in McLean, Virginia, maintains active foreign business registrations in Texas, Kansas, and Virginia, and, according to the Kansas Secretary of State's office, may be served in Kansas through its resident agent, CT Corporation System, at its registered office, 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603. The DynCorp Plan's Retirement and Employee Benefit Plans Committee may be served at this same address.

54.     Tammy Woodman resides in Texas and, upon information and belief, may be served at her residence located at 6213 Winter Park Drive, North Richland Hills, Texas 76180-5365.

55.     Barbara Dianne Walker resides in Texas and, upon information and belief, may be served at her residence located at 6700 Somerset Hills Court, Fort Worth, Texas 76132-5450.

**THE PLANS**

**The Amentum Plan**

56.     The Amentum 401(K) Retirement Plan ("Amentum Plan") is a defined contribution plan as defined by ERISA.

57.     Prior to February 1, 2020, the Amentum Plan was known as the AECOM 401(k) Retirement Plan for Specified Contract Employees, and the plan was sponsored by and administered by AECOM Global II, LLC.[4]

---

[4] According to the Amentum Plan's form 5500 filed with the U.S. Department of Labor in 2020, on January 31, 2020, AECOM closed on the sale of its Management Services business, which included AECOM Global II, LLC. The resulting new company became Amentum Holdings, LLC, the parent of Amentum Government Services Parent Holdings LLC. As a result of the sale, participants in the AECOM 401(k) Retirement Plan for Specified Contract Employees transferred to Amentum. In conjunction with the sale, sponsorship and administration of the plan transferred

58.     On or around February 1, 2020, the plan was renamed the Amentum 401(K) Retirement Plan, and Amentum Government Services Parent Holdings LLC became the plan sponsor and administrator.

59.     To date, Amentum remains the sponsor and administrator of the Amentum Plan.

**The DynCorp Plan**

60.     The DynCorp International Savings Plan ("DynCorp Plan") was a defined contribution plan as defined by ERISA.

61.     From January 1, 2017 through December 31, 2021, DynCorp was the sponsor and administrator of the DynCorp Plan.

62.     In November 2020, Amentum closed on its acquisition of DynCorp.

63.     Effective December 31, 2021, the DynCorp Plan was merged into the Amentum Plan.

**JURISDICTION AND VENUE**

64.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

65.     This Court has personal jurisdiction over Defendants because they transact business in this District, have significant contacts with this District, and because ERISA provides for nationwide service of process.

---

to Amentum Government Services Parent Holdings LLC. The name of the plan changed to Amentum 401(k) Retirement Plan effective February 1, 2020.

66.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because some or all of the breaches and violations of ERISA alleged herein occurred in this District and Defendants may be found in this District.

67.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### ERISA's FIDUCIARY STANDARDS

68.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty, prudence, diversification, and compliance with the plan document upon plan fiduciaries. 29 U.S.C. § 1104(a)(1).

69.     These fiduciary duties apply to Defendants because they are or were fiduciaries of the Plans during the Class Period.

70.     ERISA § 404(a)(1) imposes a "prudent person" standard of care on plan fiduciaries:

> [A] fiduciary shall discharge [her or his] duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of:
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

> (D)   in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C.§ 1104(a)(1).

71.     ERISA also imposes co-fiduciary duties on plan fiduciaries under ERISA § 405, which states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105.

72.     Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments must act prudently and solely in the interest of participants and beneficiaries of the plan.

73.     Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings 401(k) Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

74.     Indeed, fiduciary decisions may dramatically affect the amount of money participants save for retirement.

75.     For example, an illustration from the Department of Labor shows that a 1% difference in fees over a person's career makes a 28% difference in retirement savings. *A Look at 401(k) Plan Fees* at 2.

76.     An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

77.     Prudence requires a review at "regular intervals." *Id.* at 529 (citations omitted).

78.     As the Department of Labor explains:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

79.     As the Supreme Court recently explained in *Hughes v. Northwestern University*, , plan fiduciaries may not simply provide a menu of options, some of which are prudent, and rely "on the participants' ultimate choice" from that menu to excuse their imprudent decisions. 595 U.S. __, 142 S. Ct. 737, 741–42 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* at 738–39 (citing *Tibble*, 575 U.S. at 529–30).

80.     In *Hughes*, the Supreme Court applied *Tibble* to the pleading standard for a wide range of alleged plan deficiencies, including allegations that fiduciaries "failed to monitor the

Plans' investments in a number of ways, including … neglecting to provide cheaper and otherwise-identical alternative investments." *Hughes*, 142 S. Ct. at 741–42.

81.     The Supreme Court held that a failure to remove an imprudent investment option from a plan within a reasonable time is a fiduciary breach. *Id*.

82.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries, as the Department of Labor has explained:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

83.     In a separate publication, the Department of Labor further explains:

> The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan – referred to as fiduciaries – carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.
> . . . .
> Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After

16

careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

. . . .

**Investment fees.** By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* 1–2 (Sept. 2021), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

<u>**GENERAL ALLEGATIONS**</u>

**<u>Background of the Plans</u>**

84.     The Plans are defined contribution plans within the meaning of ERISA.

85.     A "defined contribution" or "individual account" plan is a type of retirement plan in which an individual account is set up for each participant, and benefits are based on the amounts contributed to those accounts (through employee contributions and, if applicable, employer contributions), and any income, expenses, gains, and losses.

86.     Each participant directs plan contributions in his or her individual account into one or more investment alternatives in a lineup chosen by the plan's fiduciaries.

87.     Participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of the contributions, less expenses.

88.     Defendants selected and retained various investment options made available to participants in the Plans and chose the recordkeepers for the Plans.

89.     At the choice and discretion of Defendants, various investment options were made available to participants in the Plans.

90.     The fiduciaries have exclusive control over this menu of investment alternatives available to plan participants.

91.     As the Plans' fiduciaries, Defendants must engage in a prudent and loyal process to select, monitor, remove, and retain the Plans' investment options.

92.     ERISA's duty of prudence is a continuing one; that is, a fiduciary has a continuing duty (as opposed to a one-time duty) to monitor plan investments and remove imprudent ones.

93.     As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must provide diversified investment options for the Plans. But diversification is not the only consideration for a prudent and loyal fiduciary. ERISA also requires Defendants to evaluate and monitor the fees and costs associated with the Plans' investment options and to give substantial consideration to those fees and costs when determining which options to remove or retain.

94.     Each investment option has its own fees, typically expressed as a percentage of assets under management, or expense ratio. If, for example, a fund charges 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points. The fees deducted from an investment option reduce the value of the shares, and thus reduce the returns participants receive on their investments. These plan expenses can significantly reduce the value of an account in a defined-contribution plan.

95.     Thus, "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 843 F.3d at 1198.

96.     A fiduciary's failure to switch (or timely switch) to less expensive, substantially identical funds raises "plausible" "inferences of mismanagement" that the fiduciary either "failed to negotiate aggressively enough" or was simply "asleep at the wheel":

> The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the complaint alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence.

*Davis v. Wash. Univ.*, 960 F.3d 478, 483 (8th Cir. 2020).

97.     The fees assessed to 401(k) plan participants are generally attributable to two types of services: plan recordkeeping and investment management.

98.     The Plans' fiduciaries have control over these expenses.

99.     The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation.

100.    As a result of the foregoing, these fiduciary decisions have the potential to dramatically affect the amount of money plan participants are able to save for retirement, and fiduciaries must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees.

101.    A fiduciary's "duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule." Restatement (Third) of Trusts ch. 17 intro. note, Westlaw (May 2022); *see also Tibble*, 575 U.S. at 529–30 (relying on Restatement (Third) of Trusts to interpret ERISA).

102.    This duty to engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees is particularly true for the Plans in this case because they are very large plans with the bargaining power and leverage to negotiate for, and obtain, the lowest fees.

103.    Plan fiduciaries must be continually mindful of the types of investment options available to large 401(k) plans to ensure they do not unduly risk plan participants' savings or charge unreasonable fees.

104.     As the Department of Labor explains: "Plans with more total assets may be able to lower fees by using special funds or classes of stock in funds, which generally are sold to larger group investors. 'Retail' or 'brand name' funds, which are also marketed to individual and small group investors, . . . typically charge higher fees." *A Look at 401(k) Plan Fees* at 8.

105.    Based on the most recent data available to Plaintiff, even prior to the merger of the DynCorp Plan into the Amentum Plan on July 1, 2022, each  Ppan by itself was in the top 0.5% of all 401(k) plans in terms of plan assets, making them two of the largest 401(k) plans in the United States.

106.    Because of the size of the Plans, their fiduciaries had access to investments options not generally available to smaller plans and significant bargaining power with respect to the fees and expenses that were charged against participants' investments.

107.    But, as described below, despite the size of the Plans, Defendants breached their fiduciary duties by failing to take (or timely take) advantage of this leverage and bargaining power,

and failing to take (or timely take) appropriate actions to reduce the Plans' investment expenses, or filing to exercise appropriate judgment to scrutinize each investment option that was offered in the Plans during the Class Period to ensure it was prudent.

108.    Like plaintiffs in similar cases, Plaintiff did not have, and does not have, actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, such as Defendants' processes, and execution of such processes, for selecting, monitoring, reviewing, and removing investment options, or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

109.    Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed, including, among other things, the investment options that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of the Plans' investments versus available alternatives within similarly sized plans, total cost comparisons to similarly sized plans, information regarding other available (and less expensive) share classes, and information regarding the availability and pricing of collective trusts and separate accounts. Having never managed large 401(k) plans such as the Plans, Plaintiff lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans. Plaintiff did not and could not review the meeting minutes or other evidence of Defendants' fiduciary decision-making process, or the lack thereof.

**The fiduciaries of the DynCorp Plan failed to administer the plan in a prudent manner.**

110.   Based upon the most recent data available to Plaintiff, the DynCorp Plan had between $350 million and $550 million in assets and was in the top 0.5% of all 401(k) plans based on plan assets throughout the Class Period. For example, as of December 31, 2020, the DynCorp Plan had 11,108 participants, with $547,565,337 in total assets (approximately $474,164,642 of which were invested in mutual funds).[5]

111.   As described above, Defendants DynCorp International LLC, the Retirement and Employee Benefit Plans Committee, Tammy Woodman and Barbara Diane Walker, and all other as-of-yet unidentified "John and Jane Doe" individual defendants who served on the Retirement and Employee Benefit Plans Committee during the Class Period, were fiduciaries of the DynCorp Plan prior to the December 31, 2021 merger of the Plans, and, upon information and belief, Defendants Amentum Government Services Parent Holdings LLC, Amentum Benefits Administration Committee, and Tammy Woodman became fiduciaries to the DynCorp Plan either before or upon the December 31, 2021 merger of the Plans.

112.   Based on alleged facts and the reasonable inferences regarding these facts, Defendants failed to administer the DynCorp Plan in a prudent manner, in violation of their fiduciary duties.

113.   For example, Defendants did not adhere to standard fiduciary best practices to control the DynCorp Plan's costs when looking at certain aspects of the DynCorp Plan's administration, such as monitoring investment management fees for the DynCorp Plan's

---

[5] Dyncorp Form 5500, Schedule H, Part I, Line C13(b) (filed with the U.S. Dept. Labor, Dec. 31, 2020).

investments, resulting in many of the investment options during the Class Period being more expensive than comparable investment options found in similarly sized plans.

114. Retirement plan participants pay for the cost of the plan's investment options via each option's expense ratio, based on a percentage of assets. For example, an expense ratio of 0.77% means the participant will pay $7.70 annually for every $1,000 in assets. This expense ratio thus reduces the participant's return and the compounding effect of that return. Thus, prudent plan fiduciaries must consider the effect that expense ratios have on investment returns, as it is in the best interest of participants to do so.

115. Here, Defendants could not have engaged in a prudent process as it relates to the investment management fees charged to participants in the DynCorp Plan.

116. As explained below, Defendants failed to take advantage of lower cost investment vehicles that were otherwise substantially identical to those in the DynCorp Plan, such as collective trusts (also called "collective investment trusts" and "collective trust funds"); failed to take advantage of savings offered by lower cost share classes of mutual funds already in the DynCorp Plan; and failed to offer the DynCorp Plan's participants alternative investment options that were less costly and equally or better-performing.

117. As a result of Defendants' systemic failure to properly investigate and select lower cost investment options for the DynCorp Plan's participants (as explained in detail below), a substantial portion of the menu of investment options was overpriced compared to the other options that prudent and loyal fiduciaries would have selected for the benefit of the DynCorp Plan and its participants (*e.g.*, lower price share classes of the same funds; lower price, substantially similar alternative investments; and lower price collective trust versions of substantially identical mutual funds).

118.     During years 2017, 2018, 2019, and 2020 of the Class Period, well over half of the investment options offered by the DynCorp Plan were overpriced.

119.     Had Defendants fulfilled their duties under ERISA and engaged in a prudent process to select, monitor, retain, and remove investment options from the DynCorp Plan, these failures would not have occurred.

120.     Defendants' actions were contrary to the actions of a reasonable fiduciary and cost the DynCorp Plan and its participants millions of dollars in excessive fees.

**The fiduciaries of the DynCorp Plan failed to replace the T. Rowe Price target date mutual funds with substantially identical, but much less expensive, collective trust versions of these same funds in the DynCorp Plan.**

121.     Target-date funds ("TDFs") are a class of funds that periodically rebalance asset class weights to optimize risk and returns for a predetermined time frame. The asset allocation of a target-date fund is typically designed to gradually shift to a more conservative profile over time so as to minimize risk when the target date approaches. Target-date funds offer investors the convenience of putting their investing activities on autopilot in one vehicle. Target-date funds usually mature in five-year intervals, such as 2035, 2040, and 2045.

122.     From January 1, 2017 through at least December 31, 2021 (the date the DynCorp plan merged into the Amentum Plan), the DynCorp Plan offered a series of T. Rowe Price target date mutual funds among its offerings to DynCorp Plan participants.

123.     During this period, Defendants selected and retained the investor share class of the T. Rowe Price target date mutual funds.

124.     During this period, the DynCorp Plan had enough assets to qualify for the much-cheaper collective trust version of these same target-date mutual funds.

125.    Like mutual funds, collective trusts pool plan participants' investments but can provide an even lower fee alternative than mutual funds.

126.    Collective trusts are administered by banks or trust companies—which assemble a mix of assets such as stocks, bonds, and cash—and are not available to the general public. Collective trusts contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings. Collective trusts use a unitized structure, and the units are valued daily. Participants invested in collective trusts can track their investments' daily performance online.

127.    Collective trusts are subject to regulation and oversight by the government, similar to mutual funds. Regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses.

128.    Unlike with mutual funds, many collective trust managers are fiduciaries and are subject to ERISA fiduciary standards. In other words, they must manage the collective trusts solely in the plan participants' interest, which is a benefit to plan participants.

129.    Collective trusts are also subject to state and federal banking regulations that provide comparable protections to the Investment Company Act.

130.    To state it another way, collective trusts are subject to robust regulations, but do not have to be registered with the Securities and Exchange Commission because, unlike mutual funds, they are not a retail product available to the general public.

131.    Collective trusts thus can have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs.

132.    Retirement plans have used alternatives to mutual funds, such as collective trusts, for decades, and fiduciaries of other large plans were prudently paying attention and using their scale to reduce costs by offering lower-cost collective trust versions of funds.

133.    Since at least 2017, the DynCorp Plan utilized a collective trust—the T. Rowe Price Stable Value Common Tr-E—as one of its investment options; however, the DynCorp Plan failed to offer other lower-cost collective trust options.

134.    In particular, even though the DynCorp Plan had enough assets in its T. Rowe Price target-date mutual funds to qualify for the lower-cost collective trust counterpart of such funds and could have offered the collective trust version, the DynCorp Plan did not do so.

135.    The T. Rowe Price target-date mutual funds used by the DynCorp Plan were as much as 73% more expensive than the substantially identical collective trust fund version.

136.    The collective-trust-based T. Rowe Price Retirement Trust target-date series is substantially identical—other than its lower cost—to the mutual-fund-based T. Rowe Price Retirement Fund target-date series.

137.     The T. Rowe Price Retirement Trust target-date series has the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay, and underlying investments as the T. Rowe Price Retirement Funds target-date series.

138.    In simple terms, Defendants failed to switch to an investment option that was the same investment in a different wrapper at a much lower price, a manifestation of that Defendants' failure to prudently monitor the DynCorp Plan's investment options.

139.    From January 1, 2017 through at least December 31, 2021, the DynCorp Plan's T. Rowe Price target-date mutual funds were significantly more expensive than their substantially identical collective trust counterparts.

140. The following chart provides an example of how much more expensive the Dyncorp Plan's (which merged into the Amentum Plan effective December 31, 2021) T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2021:

| T. Rowe Price Target Date Mutual Fund in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2005 | 0.49% | T. Rowe Price Retirement 2005 Tr-F | 0.37% | 32% |
| T. Rowe Price Retirement 2010 | 0.49% | T. Rowe Price Retirement 2010 Tr-F | 0.37% | 32% |
| T. Rowe Price Retirement 2015 | 0.51% | T. Rowe Price Retirement 2015 Tr-F | 0.37% | 38% |
| T. Rowe Price Retirement 2020 | 0.53% | T. Rowe Price Retirement 2020 Tr-F | 0.37% | 43% |
| T. Rowe Price Retirement 2025 | 0.55% | T. Rowe Price Retirement 2025 Tr-F | 0.37% | 49% |
| T. Rowe Price Retirement 2030 | 0.58% | T. Rowe Price Retirement 2030 Tr-F | 0.37% | 57% |
| T. Rowe Price Retirement 2035 | 0.59% | T. Rowe Price Retirement 2035 Tr-F | 0.37% | 59% |
| T. Rowe Price Retirement 2040 | 0.60% | T. Rowe Price Retirement 2040 Tr-F | 0.37% | 62% |
| T. Rowe Price Retirement 2045 | 0.62% | T. Rowe Price Retirement 2045 Tr-F | 0.37% | 68% |
| T. Rowe Price Retirement 2050 | 0.63% | T. Rowe Price Retirement 2050 Tr-F | 0.37% | 70% |
| T. Rowe Price Retirement 2055 | 0.64% | T. Rowe Price Retirement 2055 Tr-F | 0.37% | 73% |
| T. Rowe Price Retirement 2060 | 0.64% | T. Rowe Price Retirement 2060 Tr-F | 0.37% | 73% |
| T. Rowe Price Retirement 2065 | 0.64% | T. Rowe Price Retirement 2065 Tr-F | 0.37% | 73% |
| T. Rowe Price Retirement Balanced | 0.49% | T. Rowe Price Retirement Balanced Tr-F | 0.37% | 32% |
| Average | 0.57% | | 0.37% | 54% |

141.   The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2020:

| T. Rowe Price Target Date Mutual Fund in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2005 | 0.52% | T. Rowe Price Retirement 2005 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2010 | 0.52% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2015 | 0.55% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 28% |
| T. Rowe Price Retirement 2020 | 0.57% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 33% |
| T. Rowe Price Retirement 2025 | 0.61% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 42% |
| T. Rowe Price Retirement 2030 | 0.64% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 49% |
| T. Rowe Price Retirement 2035 | 0.67% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 56% |
| T. Rowe Price Retirement 2040 | 0.69% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 60% |
| T. Rowe Price Retirement 2045 | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2050 | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2055 | 0.71% | T. Rowe Price Retirement 2055 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2060 | 0.71% | T. Rowe Price Retirement 2060 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement Balanced | 0.50% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 16% |
| **Average** | **0.62%** | | **0.43%** | **45%** |

142.   The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2019:

| T. Rowe Price Target Date Mutual Fund in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2005 | 0.52% | T. Rowe Price Retirement 2005 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2010 | 0.52% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 21% |
| T. Rowe Price Retirement 2015 | 0.55% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 28% |
| T. Rowe Price Retirement 2020 | 0.58% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 35% |
| T. Rowe Price Retirement 2025 | 0.62% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 44% |
| T. Rowe Price Retirement 2030 | 0.65% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 51% |
| T. Rowe Price Retirement 2035 | 0.68% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 58% |
| T. Rowe Price Retirement 2040 | 0.70% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 63% |
| T. Rowe Price Retirement 2045 | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2050 | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2055 | 0.71% | T. Rowe Price Retirement 2055 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement 2060 | 0.71% | T. Rowe Price Retirement 2060 Tr-F | 0.43% | 65% |
| T. Rowe Price Retirement Balanced | 0.50% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 16% |
| Average | 0.63% | | 0.43% | 46% |

143.   The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2018:

| T. Rowe Price Target Date Mutual Fund in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| **T. Rowe Price Retirement 2005** | 0.52% | T. Rowe Price Retirement 2005 Tr-F | 0.43% | 21% |
| **T. Rowe Price Retirement 2010** | 0.52% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 21% |
| **T. Rowe Price Retirement 2015** | 0.55% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 28% |
| **T. Rowe Price Retirement 2020** | 0.58% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 35% |
| **T. Rowe Price Retirement 2025** | 0.62% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 44% |
| **T. Rowe Price Retirement 2030** | 0.65% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 51% |
| **T. Rowe Price Retirement 2035** | 0.68% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 58% |
| **T. Rowe Price Retirement 2040** | 0.70% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 63% |
| **T. Rowe Price Retirement 2045** | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2050** | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2055** | 0.71% | T. Rowe Price Retirement 2055 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2060** | 0.71% | T. Rowe Price Retirement 2060 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement Balanced** | 0.50% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 16% |
| **Average** | **0.63%** | | **0.43%** | **46%** |

144.   The expense ratios in the other years of the Class Period were similar to the examples for the years shown above.

145.     A prudent fiduciary conducting a prudent, impartial review of the DynCorp Plan's investments would have identified the collective trust option and transferred the DynCorp Plan's investments into the above-referenced collective trusts at the earliest opportunity.

146.     Defendants failed to take such action, thereby acting imprudently.

147.     The T. Rowe Price target-date mutual funds used by the DynCorp Plan were as much as 73% more expensive than the substantially identical collective trust fund versions that the DynCorp Plan could have utilized.

148.     Because the marketplace for retirement plans is competitive and the DynCorp Plan's pool of assets are large, it is plausible, and indeed reasonable, to infer that Defendants were asleep at the wheel or did not negotiate aggressively enough and are guilty of a failure of effort or competence and failure to act with the immediacy that ERISA requires.

149.     At all times during the Class Period, had Defendants utilized a prudent process and been properly discharging their duties for the exclusive benefit of the participants and allowing the participants to be charged only reasonable fees, Defendants would have known or should have known of the existence of the same T. Rowe Price target-date investment in the lower-cost collective trust offering and would therefore have promptly transferred the DynCorp Plan's funds into these lower cost versions of the same investment options.

150.     Moreover, Defendants not only failed to utilize the collective trust version of the T. Rowe Price target-date funds, but also inexplicably included only the investor share class in the DynCorp Plan, instead of the cheaper, substantially identical, institutional share class of the funds.

151.     Even in 2021, when the Amentum Plan finally switched from the Vanguard target-date mutual funds to the lower-cost Vanguard target-date collective trust counterparts, Defendants still neglected to swap out the DynCorp Plan's T. Rowe Price target-date mutual fund series in

favor of the lower fee T. Rowe Price target-date collective trust series.

152. When the DynCorp Plan and Amentum Plan were merged effective December 31, 2021, the Defendants retained the higher fee T. Rowe Price target-date mutual fund series rather than switching to the lower fee T. Rowe Price target-date collective trust series or mapping participants over to the other investment options in the plan such as the even-lower-fee Vanguard target date fund collective trust series.

153. Failing to utilize the lower cost collective trust options in the DynCorp Plan shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

154. As a result of Defendants' breach of their fiduciary duties, the DynCorp Plan and its participants incurred excessive investment fees, costing them millions of dollars.

**The fiduciaries of the DynCorp Plan failed to replace the higher fee T. Rowe Price mutual funds with substantially identical, but much less expensive, collective trust versions of these same funds in the DynCorp Plan.**

155. In addition to failing to replace the higher fee T. Rowe Price target date mutual funds with their corresponding lower-cost collective trust version, the Defendants also failed to replace other mutual fund investments with substantially identical collective trust versions of those same funds.

156. The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price single asset class mutual funds were than their substantially identical collective trust counterparts in 2021:

| In-Plan Mutual Fund Option | Expense Ratio | Lower Cost Collective Investment Trust | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Equity Income | 0.65% | T. Rowe Price Equity Income Tr-D | 0.52% | 25% |
| T. Rowe Price Growth Stock | 0.64% | T. Rowe Price Growth Stock Tr-A | 0.50% | 28% |

157.    The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price single asset class mutual funds were than their substantially identical collective trust counterparts in 2020:

| In-Plan Mutual Fund Option | Expense Ratio | Lower Cost Collective Investment Trust | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Equity Income | 0.64% | T. Rowe Price Equity Income Tr-D | 0.52% | 23% |
| T. Rowe Price Growth Stock | 0.65% | T. Rowe Price Growth Stock Tr-D | 0.52% | 25% |

158.    The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price single asset class mutual funds were than their substantially identical collective trust counterparts in 2019:

| In-Plan Mutual Fund Option | Expense Ratio | Lower Cost Collective Investment Trust | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Equity Income | 0.64% | T. Rowe Price Equity Income Tr-D | 0.52% | 23% |
| T. Rowe Price Growth Stock | 0.65% | T. Rowe Price Growth Stock Tr-D | 0.52% | 25% |

159.    The expense ratios in the other years of the Class Period preceding 2019 were similar to the examples for the years shown above.

160.    Moreover, Defendants not only failed to utilize the collective trust version of these mutual funds, but also inexplicably failed to use the cheaper, substantially identical, institutional share class of these funds.

161.    Failing to utilize the lower cost collective trust options (or lower cost institutional share classes) in the DynCorp Plan shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

**The fiduciaries of the DynCorp Plan failed to offer the lowest-cost share classes of the funds offered by the DynCorp Plan.**

162.     The DynCorp Defendants also failed to take advantage of lower-cost share classes of the investment options they already offered in the DynCorp Plan.

163.     Larger asset balances in 401(k) plans lead to economies of scale and special pricing with mutual funds and other investment products.

164.     For example, many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors with more expensive share classes generally targeted at smaller investors with less bargaining power, while lower cost shares are targeted at "institutional investors" with more assets (generally $1 million or more) and therefore greater bargaining power.

165.     Typically, there is no difference between share classes other than cost—*i.e.*, the funds hold substantially identical investments and have the same manager.

166.     Fiduciaries must consider the size and purchasing power of their plan in selecting share classes or alternative investments.

167.     It is a foundational investment management principle that an investor with a larger amount to invest can qualify or negotiate for lower fees.

168.     Large defined contribution plans, such as the DynCorp Plan, qualify for lower-cost share classes and alternative investments because of their size and purchasing power.

169.     Prudent fiduciaries will search for and select the lowest-priced share class available as quickly as possible.

170.     During the Class Period, the fiduciaries of the DynCorp Plan  failed to offer the lowest-cost share class of the already in-plan mutual funds that were available to the DynCorp Plan.

171.    No reasonable, prudent justification exists for the Defendants' failure to offer the lowest-cost share class available.

172.    At all times during the Class Period, the fiduciaries of the DynCorp Plan knew or should have known of the existence of cheaper share classes of the mutual funds offered in the DynCorp Plan and thus also should have promptly identified the prudence of transferring the DynCorp Plan's funds into the lower-cost share classes of said mutual funds.

173.    As demonstrated below, the Defendants failed to ensure that the DynCorp Plan and its participants were invested in the lowest-cost share class available for the DynCorp Plan's investment options and did not promptly switch to these lower-cost alternatives when they became available.

174.    The following chart provides an example of how much more expensive the funds in the DynCorp Plan were than their substantially identical, lower-cost counterparts (using 2021 expense ratios):

| In-Plan Option | Expense Ratio | Lower Cost Institutional Class Shares | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Fidelity Low-Priced Stock K | 0.65% | Fidelity Low-Priced Stock K6 | 0.56% | 16% |
| Vanguard Extended Market Index Admiral | 0.06% | Vanguard Extended Market Index Instl | 0.05% | 20% |
| Vanguard Institutional Index I | 0.04% | Vanguard Institutional Index Instl Plus | 0.02% | 100% |
| Vanguard Total Bond Market Index Adm | 0.05% | Vanguard Total Bond Market Index I | 0.04% | 25% |

175.    The following chart provides an example of how much more expensive the funds in the DynCorp Plan were than their substantially identical, lower-cost counterparts (using 2020 expense ratios):

| In-Plan Option | Expense Ratio | Lower Cost Institutional Class Shares | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Fidelity Low-Priced Stock K | 0.78% | Fidelity Low-Priced Stock K6 | 0.69% | 13% |
| Vanguard Extended Market Index Admiral | 0.06% | Vanguard Extended Market Index Instl | 0.05% | 20% |
| Vanguard Total Bond Market Index Adm | 0.05% | Vanguard Total Bond Market Index I | 0.04% | 25% |

176.    No prudent, loyal reason exists for not having offered, or for not having switched and more promptly offered, the DynCorp Plan's participants lower-cost share classes of the same funds.

177.    Had Defendants engaged in a prudent, loyal process to select, monitor, retain, and remove investment options from the DynCorp Plan, they would have utilized the lower-cost share classes of the mutual funds in the DynCorp Plan. Defendants' failures in this regard caused the DynCorp Plan and its participants to pay unnecessary fees.

178.    Failing to move funds in the DynCorp Plan to available lower price share classes shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

**The fiduciaries of the DynCorp Plan selected and retained investment options that were more expensive than substantially similar and better-performing alternative investment options available to the DynCorp Plan.**

179.    The DynCorp Plan offered between 10 and 13 single asset class investment options during the Class Period.

180.    At least 4 of these single asset class investment options were more expensive, and in most cases considerably more expensive, than substantially similar and better performing

alternative investment options available to the DynCorp Plan.

181.    These expensive funds, and examples of substantially similar lower-cost alternative investment options, are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of 2020, which is in the middle of the class period):

| In-Plan Option | Expense Ratio | Lower Cost Alternative Option(s) | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Growth Stock Fund | 0.65% | TIAA-CREF Large-Cap Gr Index Instl | 0.05% | 1200% |
| | | Vanguard Mega Cap Growth Index Instl | 0.06% | 983% |
| Vanguard Institutional Index I (tracks S & P 500 Index) | 0.04% | Fidelity 500 Index (tracks S & P 500 Index) | 0.02% | 100% |
| T. Rowe Price Equity Income | 0.64% | Vanguard S&P 500 Value Index Instl | 0.08% | 700% |
| | | Vanguard Windsor Fund Admiral | 0.20% | 220% |
| PIMCO Total Return Instl | 0.70% | Vanguard Core Bond Admiral | 0.10% | 600% |

182.    The lower-cost investment option alternatives listed in the chart above performed comparably with or better than, and in some cases significantly better than, their comparable higher-cost option in the DynCorp Plan.

183.    The expense ratios for the in-plan and substantially similar alternative investment options in the other years of the Class Period were similar to the expense ratios shown above, which are provided simply as a specific illustration.

184.    The substantially similar, but lower-cost, alternative investment options in the chart above were identified using an industry recognized software program that uses quantitative methods, such as returns-based and holdings-based correlation analysis, to find funds that are highly similar to the fund being analyzed, resulting in an apples-to-apples comparison.

185.    In addition to the similar, but lower-cost, alternative investment options identified

above by Plaintiff, Defendants also failed to lower fees in the DynCorp Plan by simply replacing index funds from one investment company (Vanguard) with less expensive funds from another investment company (State Street).

186.    Index funds are a type of fund that tracks the returns of a particular market index.

187.    Market indexes measure the performance of a "basket" of securities, like stocks or bonds. This "basket" of securities is supposed to represent a sector of an economy or stock market. A person may invest in an index indirectly, through an index fund that tracks a market index.

188.    Generally, index funds are a passive style—meaning no fund manager is required—of investing, aiming to maximize returns over a long period of time by not buying and selling securities very often.

189.    Various investment companies may provide investment products that track the same index.  For example, well-known investment companies such as Vanguard, Fidelity, and State Street all offer investment products that track the S & P 500 Index. However, the price of these products, which track the exact same index, can vary by as much as 250%.

190.    Examples of substantially similar but lower-cost alternative index options are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of May 2022):

| In-Plan Option | Expense Ratio | Lower Cost Alternative Option | Expense Ratio | % Excess Cost |
|---|---|---|---|---|
| Vanguard Institutional Index I (VINIX) | 0.035% | State Street S & P 500 Index II | 0.01% | 250% |
| Vanguard Total Bond Market Index I (VBTIX) | 0.04% | State Street U.S. Bond Index Fund | 0.02% | 100% |

191.    A prudent and loyal fiduciary would not have selected investment options that were significantly more expensive but performed no better (or worse) than substantially similar alternative investment options.

192.    No reasonable, prudent justification exists for Defendants' failure to offer these lower-cost alternatives.

**The Amentum Plan included imprudent investment options at the time of and following the December 31, 2021 merger.**

193.    After the merger, the Amentum Plan held over $1.5 billion in assets with 21,754 participants.

194.    Despite the enormous size of the merged Amentum Plan, the fiduciaries of the Amentum Plan failed to administer the Amentum Plan in a prudent manner and failed to fulfill their fiduciary duties regarding the Amentum Plan's investment options.

195.    As described above, Amentum Government Services Parent Holdings LLC, the Amentum Benefits Administration Committee, Tammy Woodman, and all other as-of-yet unidentified individuals who serve on the Amentum Benefits Administration Committee during the Class Period were fiduciaries of the Amentum Plan (the "Amentum Defendants").

196.    First, upon merger of the Plans, the Amentum Defendants allowed the DynCorp Plan's investment options to migrate to the Amentum Plan, rather than removing those imprudent options identified above, including the T. Rowe Price target date mutual funds.

197.    Second, as with the DynCorp Plan, the Amentum Defendants failed to replace mutual fund investments in the Amentum Plan with substantially identical collective trust versions of those same funds.

198.    For example, the Amentum Defendants failed to replace the more-expensive Fidelity Growth Company Fund (at an 83 basis points expense ratio) with its less-expensive substantially identical collective trust counterpart, the Fidelity Growth Company Commingled Pool (at a 43 basis points expense ratio).

199.    Furthermore, similar to the DynCorp Plan, the Amentum Defendants failed to take

advantage of lower-cost share classes of the investment options they already offered in the Amentum Plan.

200.    The following chart provides an example of how much more expensive the funds in the Amentum Plan are than their substantially identical, lower-cost counterparts (using 2021 expense ratios):

| In-Plan Option | In-Plan Expense Ratio | Lower Cost Institutional Class Shares | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds Europacific Growth A | 0.82% | American Funds Europacific Growth R6 | 0.46% | 78% |
| Fidelity Balanced | 0.51% | Fidelity Balanced K | 0.45% | 13% |
| | | | | |
| Metropolitan West Total Return Bd M | 0.67% | Metropolitan West Total Return Bd I | 0.45% | 49% |
| Oakmark Investor | 0.91% | Oakmark R6 | 0.63% | 44% |
| T. Rowe Price Dividend Growth | 0.63% | T. Rowe Price Dividend Growth I | 0.5% | 26% |
| Vanguard Developed Markets Index Admiral | 0.07% | Vanguard Developed Markets Index Instl | 0.05% | 40% |
| Vanguard Explorer Inv | 0.41% | Vanguard Explorer Inv | 0.30% | 37% |
| Vanguard Extended Market Index Admiral | 0.06% | Vanguard Extended Market Index Instl | 0.05% | 20% |
| Vanguard Institutional Index I | 0.04% | Vanguard Institutional Index Instl Plus | 0.02% | 100% |
| Vanguard Total Bond Market Index Adm | 0.05% | Vanguard Total Bond Market Index I | 0.04% | 25% |

201.    At all times during the Class Period, the Amentum Defendants knew or should have known of the existence of cheaper share classes of the mutual funds offered in the Amentum Plan and thus also should have promptly identified the prudence of transferring the Amentum Plan's funds into the lower-cost share classes of said mutual funds.

202.    The Amentum Defendants failed to ensure that the Amentum Plan and its participants were invested in the lowest-cost share class available as an investment option and did not promptly switch to these lower-cost alternatives when they became available.

## CLASS ACTION ALLEGATIONS

203.    In addition to bringing this action on behalf of the Plans, pursuant to ERISA, Plaintiff also brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class identified as follows:  All participants in and beneficiaries of the DynCorp Plan from the date six years before the filing of this Complaint through the December 31, 2021 merger of the DynCorp Plan into the Amentum Plan, and all participants in and beneficiaries of the Amentum Plan from January 1, 2022 to present, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families (the "Class").

204.    Certification of the Class is appropriate under Rule 23(a) and Rule 23(b)(1), (b)(2), and/or (b)(3).

205.    The DynCorp Plan and Amentum Plan had thousands of participants, all of whom suffered from the imprudent investment options and excessive and improper fees alleged herein.

206.    The number of Class members is so large that joinder of all its members is impracticable.

207.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual class members

208.    Common legal and factual questions include, but are not limited to:

(a)    Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plans and services for the Plans;

(b)    Whether the investment decisions made by Defendants were prudent;

(c)    Whether the investment decisions made by Defendants were solely in the interests of the Plans' participants and beneficiaries;

(d)    Whether the defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plans were being managed in compliance with ERISA;

(e)     Whether the Plans suffered losses as a result of Defendants' fiduciary breaches; and

(f)     Whether Defendants' acts proximately caused losses to the Plans and, if so, the appropriate relief to which Plaintiff, on behalf of the Plans and the Class, is entitled.

209.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

210.     Plaintiff will fairly and adequately represent the Class and has retained counsel competent in the prosecution of ERISA class-action litigation.

211.     Plaintiff has no interests antagonistic to those of other members of the Class.

212.     Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

213.     Plaintiff has standing to bring this action on behalf of the Plans because he is a current participant in the Amentum Plan and previously participated in the DynCorp Plan before the merger, and he was injured by Defendants' unlawful conduct.

214.     Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently or as of the time the account was distributed, and what his account is or would have been worth but for Defendants' breaches of fiduciary duty as described herein.

215.     A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system with respect to the resolution of

the issues raised in this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. This case presents no unusual management difficulties.

216.   Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

217.   Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

218.   In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

219.   In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

<u>**CLAIMS FOR RELIEF**</u>

<u>**First Claim for Relief: Breach of ERISA Fiduciary Duties as to the DynCorp Plan**</u>

220.    Plaintiff realleges and incorporates by reference all other allegations in this Complaint as if fully set forth herein.

221.    Defendants were fiduciaries of the DynCorp Plan within the meaning of 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the DynCorp Plan or disposition of the DynCorp Plan's assets. Amentum has assumed DynCorp's fiduciary liability by virtue of its acquisition of DynCorp.

222.    As the fiduciaries of the DynCorp Plan, Defendants breached their fiduciary duties to the DynCorp Plan and its participants and beneficiaries in multiple respects and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

223.    As detailed above, Defendants had fiduciary responsibilities with respect to selecting, monitoring, retaining, and removing investment options in the DynCorp Plan and minimizing fees.

224.    As detailed above, Defendants caused the DynCorp Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities and failed to leverage the size of the DynCorp Plan to minimize costs.

225.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the DynCorp Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the DynCorp Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

226.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the DynCorp Plan with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

227.    Defendants knowingly participated in the breaches of each of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such defendant's own duties, and knew of the violations by the other of Defendants but failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

228.    Accordingly, each of the Defendants is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the DynCorp Plan and its participants have paid substantial excess investment management and other related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2).

229.    The DynCorp Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

230.    If Defendants had complied with their fiduciary obligations, then the DynCorp Plan would not have suffered these losses, and DynCorp Plan participants would have more money available to them for their retirement.

231.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the DynCorp Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches, and Plaintiff is entitled to equitable relief and other appropriate relief for these Defendants' breaches as set forth in Plaintiff's Prayer for Relief.

**Second Claim for Relief: Breach of ERISA Fiduciary Duties as to the Amentum Plan
(against the Amentum Defendants)**

232.   Plaintiff realleges and incorporates by reference all other allegations in this Complaint as if fully set forth herein.

233.   From January 1, 2022 through present, Amentum, the Amentum Benefits Administration Committee, Tammy Woodman, and certain Amentum officers, employees, contractors, entities, and/or agents, were fiduciaries of the Amentum Plan within the meaning of 29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)), in that they exercised discretionary authority or control over the administration and/or management of the Amentum Plan or disposition of the Amentum Plan's assets.

234.   As the fiduciaries of the Amentum Plan, the Amentum Defendants breached their fiduciary duties to the Amentum Plan and its participants and beneficiaries in multiple respects and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

235.   As detailed above, the Amentum Defendants had fiduciary responsibilities with respect to selecting, monitoring, retaining, and removing investment options in the Amentum Plan.

236.   As detailed above, the Amentum Defendants caused the Amentum Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, failed to leverage the size of the Amentum Plan to minimize costs, and failed to monitor and remove imprudent investment options, including the imprudent options that migrated from the DynCorp Plan as a result of the Plans' merger.

237.   By the conduct and omissions described above, the Amentum Defendants failed to discharge their duties with respect to the Amentum Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and

beneficiaries and defraying reasonable expenses of administering the Amentum Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

238.    By the conduct and omissions described above, the Amentum Defendants failed to discharge their duties with respect to the Amentum Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

239.    The Amentum Defendants knowingly participated in the breaches of each of the other of these Defendants, knowing that such acts were a breach, enabled the other of these Defendants to commit breaches by failing to lawfully discharge such defendant's own duties, and knew of the violations by the other of these Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

240.    Accordingly, each of the Amentum Defendants is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the Amentum Plan and its participants have paid substantial excess investment management and other related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which these Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2).

241.    The Amentum Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

242.    If these Defendants had complied with their fiduciary obligations, then the Amentum Plan would not have suffered these losses, and Amentum Plan participants would have more money available to them for their retirement.

243.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Amentum Defendants are liable to restore to the Amentum Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches, and Plaintiff is entitled to equitable relief and other appropriate relief for these Defendants' breaches as set forth in Plaintiff's Prayer for Relief.

**Third Claim for Relief: Failure to Adequately Monitor Other Fiduciaries as to the DynCorp Plan**

244.     Plaintiff realleges and incorporates by reference all other allegations in this Complaint as if fully set forth herein.

245.     Upon information and belief, DynCorp and Amentum (after its acquisition of DynCorp in November 2020) appointed and thus had a duty to monitor the Retirement and Employee Benefit Plans Committee to ensure that it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the DynCorp Plan in the event the relevant committee was not fulfilling those duties.

246.     In addition, as plan sponsors, DynCorp and Amentum, at different times during the Class Period, had a duty to monitor the Retirement and Employee Benefit Plans Committee and ensure it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the DynCorp Plan in the event the relevant committee was not fulfilling those duties.

247.     One or more of these Defendants had the authority and obligation to monitor the Retirement and Employee Benefit Plans Committee and were aware the Retirement and Employee Benefit Plans Committee had critical responsibilities as a fiduciary of the DynCorp Plan.

248.     One or more of these Defendants had a duty to ensure the Retirement and Employee Benefit Plans Committee possessed the needed qualifications and experience to carry out its duties;

48

had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the DynCorp Plan's investments; and reported regularly to it or them.

249.    Defendants breached their fiduciary monitoring duties by, *inter alia*, the following: (a) failing to monitor and evaluate the performance of the Retirement and Employee Benefit Plans Committee or have a system in place for doing so, standing idly by as the DynCorp Plan suffered significant losses as a result of the Retirement and Employee Benefit Plans Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the DynCorp Plan's investments were evaluated; and (c) failing to remove the Retirement and Employee Benefit Plans Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the DynCorp Plan, all to the detriment of the DynCorp Plan and the retirement savings of the DynCorp Plan's participants.

250.    As a consequence of the foregoing breaches of the duty to monitor, the DynCorp Plan suffered millions of dollars of losses.

251.    Had Defendants complied with their fiduciary obligations, the DynCorp Plan would not have suffered these losses, and participants of the DynCorp Plan would have had more money available to them for their retirement.

252.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the DynCorp Plan all losses caused by their failure to adequately monitor the Retirement and Employee Benefit Plans Committee, and Plaintiff is entitled to equitable relief and other appropriate relief as set forth in Plaintiff's Prayer for Relief.

**<u>Fourth Claim for Relief: Failure to Adequately Monitor Other Fiduciaries as to the Amentum Plan (against the Amentum Defendants)</u>**

253.    Plaintiff realleges and incorporates by reference all other allegations in this

Complaint as if fully set forth herein.

254.     Upon information and belief, Amentum appointed and thus had a duty to monitor the Amentum Benefits Administration Committee and ensure it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Amentum Plan in the event the Amentum Benefits Administration Committee was not fulfilling those duties.

255.     In addition, as plan sponsor, Amentum had a duty to monitor the Amentum Benefits Administration Committee and ensure that it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Amentum Plan in the event the Committee was not fulfilling those duties.

256.     Amentum had the authority and obligation to monitor the Amentum Benefits Administration Committee and was aware the Amentum Benefits Administration Committee had critical responsibilities as a fiduciary of the Amentum Plan.

257.     Amentum had a duty to ensure the Amentum Benefits Administration Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Amentum Plan's investments; and reported regularly to it or them.

258.     The Amentum Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Amentum Benefits Administration Committee or have a system in place for doing so, standing idly by as the Amentum Plan suffered significant losses as a result of the Amentum Benefits Administration Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Amentum Plan's investments were evaluated; and (c) failing to remove the Amentum Benefits

Administration Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Amentum Plan, and caused the Amentum Plan to pay excessive recordkeeping fees, all to the detriment of the Amentum Plan and the retirement savings of the Amentum Plan's participants.

259.    As a consequence of the foregoing breaches of the duty to monitor, the Amentum Plan suffered millions of dollars of losses.

260.    Had Defendants complied with their fiduciary obligations, the Amentum Plan would not have suffered these losses, and participants of the Amentum Plan would have had more money available to them for their retirement.

261.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Amentum Plan all losses caused by its failure to adequately monitor the Amentum Benefits Administration Committee, and Plaintiff is entitled to equitable relief and other appropriate relief as set forth in Plaintiff's Prayer for Relief.

## PRAYER FOR RELIEF

Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

(a)    A determination that Plaintiff may proceed on behalf of the Amentum Plan and DynCorp Plan, in accordance with ERISA;

(b)    A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

(c)    Designation of Plaintiff as Class Representative, and designation of Plaintiff's counsel as Class Counsel;

(d)    An order certifying the proposed Class;

(e)      A declaration that Defendants, and each of them, have breached their fiduciary duties under ERISA;

(f)      An order compelling Defendants to make good to the Amentum Plan and DynCorp Plan all losses resulting from Defendants' breaches of their fiduciary duties as outlined herein, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits that the participants would have made if Defendants had fulfilled their fiduciary obligations;

(g)      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(h)      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(i)      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of the Plans' fiduciaries deemed to have breached their fiduciary duties;

(j)      An award of pre-judgment interest;

(k)      An award of costs pursuant to 29 U.S.C. § 1132(g);

(l)      A service award to the class representatives;

(m)      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

(n)      Such other and further relief as the Court deems equitable and just.

### DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the place of trial of this cause of action.

Respectfully submitted by,

 /s/  Scott C. Nehrbass

Scott C. Nehrbass, KS #16285
FOULSTON SIEFKIN LLP
7500 College Blvd. Suite 1400
Overland Park, KS 66210-4041
(P) 913.253.2144 | (F) 913.498.2101
snehrbass@foulston.com

Boyd A. Byers, KS #16253
Emily L. Matta, KS #28596
FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, Kansas 67206-4466
(P) 316.291.9716 | (F) 316.771.6011
bbyers@foulston.com
ematta@foulston.com

*Counsel for Plaintiff and the Putative Class*