## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JAY MIDDLETON and GEORGE A. LAWRENCE, individually and on behalf of the AMENTUM 401(K) RETIREMENT PLAN and DYNCORP INTERNATIONAL SAVINGS PLAN, and all others similarly situated,

*Plaintiffs*,

v.

AMENTUM GOVERNMENT SERVICES PARENT HOLDINGS LLC, AMENTUM BENEFITS ADMINISTRATION COMMITTEE, AMENTUM RETIREMENT & INVESTMENT COMMITTEE, TAMMY WOODMAN, GREG ROBINSON, BOB RUDISIN, DEBBIE BECHTEL, ANGIE MYERS, ALICE MCABEE, MATT STONE, JAKE KENNEDY, LARRY GOLDMAN, ANN MCRITCHIE, DYNCORP INTERNATIONAL LLC, THE RETIREMENT AND EMPLOYEE BENEFIT PLANS COMMITTEE, BARBARA WALKER, and JOHN AND JANE DOE DEFENDANTS 1-30,

*Defendants*.

Case No. 2:23-cv-02456

**FIRST AMENDED CLASS ACTION COMPLAINT**

### INTRODUCTION

Plaintiffs Jay Middleton and Georga A. Lawrence, on behalf of the Amentum 401(k) Retirement Plan (the "Amentum Plan") and the DynCorp International Savings Plan (the "DynCorp Plan") (collectively, the "Plans"), themselves, and all others similarly situated, bring this class action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against the fiduciaries of the Amentum Plan and the fiduciaries of the DynCorp Plan (which merged into the Amentum Plan effective December 31, 2021), for breaches of their fiduciary and other duties. The liable fiduciaries include Amentum Government Services Parent Holdings LLC, the Amentum Benefits Administration Committee, and the Amentum Retirement

1

& Investment Committee; DynCorp International LLC and The Retirement and Employee Benefit Plans Committee (of the DynCorp Plan); and individual members of the committees, including Tammy Woodman, Greg Robinson, Bob Rudisin, Debbie Bechtel, Angie Myers, Alice McAbee, Matt Stone, Jake Kennedy, Larry Goldman, Ann McRitchie, Barbara Walker, and John and Jane Does 1–30 (collectively "Defendants").

Plaintiffs bring this action by and through his undersigned attorneys based upon personal knowledge, information contained in the Plans' publicly available Form 5500 series filings with the United States Department of Labor, the account information and statements provided to them as a participant in the Plans, and other information publicly available or obtained through counsel's preliminary investigation. Plaintiff anticipates that discovery will uncover further support for the allegations in this Complaint, and, potentially, for additional claims.

As described herein, Defendants have breached their fiduciary duties to Plaintiff, in violation of ERISA, to the detriment of the Amentum Plan, the DynCorp Plan, and the Plans' participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement going forward, and obtain equitable and other relief as provided by ERISA. Plaintiffs request this relief for the benefit of the Plans and their participants and beneficiaries.

In support of their claims, Plaintiffs state and allege as follows:

<u>**NATURE OF THE CASE**</u>

1.      Plaintiffs bring this case on behalf of the Amentum Plan and the DynCorp Plan, himself, and all persons who were and/or are participants in or beneficiaries of either or both the Amentum Plan and the DynCorp Plan and fall within the definition of the Class set forth herein,

2

pursuant to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*

2.    Plaintiffs bring this case against the Defendants, as fiduciaries of the Plans, for breaches of their fiduciary duties during the Class Period (defined as the six-year period preceding the filing of the original Complaint in this case through the date of judgment).

3.    To protect plan participants and beneficiaries, ERISA imposes a strict fiduciary duties of prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(A)–(B). These fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

4.    Employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 2 (Sept. 2019) [hereinafter *A Look at 401(k) Plan Fees*], https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

5.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of services to the plan and investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust

assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7. Indeed, an employer has a specific obligation to consider the fees and expenses paid by [a] plan.

6.        "Cost-conscious management is fundamental to prudence in the investment function, and should be applied not only in making investments but also in monitoring and reviewing investments." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (internal quotations and citations omitted).

7.        Additional fees of only 0.18% or 0.4% can have a large impact on a participant's investment results over time because plan participants and beneficiaries "subject to higher fees . . . lose not only the money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Id.* (internal quotations and citations omitted).

8.        "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)). And if the fiduciaries "fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id*.

9.        According to Morningstar's 2023 Retirement Plan Landscape Report, the Amentum Plan is a "Mega plan" because it has over $500 million in plan assets.

10.       Compared to other 401(k) plans, the Brightscope/ICI Defined Contribution Plan Profile report dated September 2022 (utilizing 2019 data) places the Amentum Plan within the top 0.2% of 401(k) plans based on plan assets (out of 603,217 total 401(k) plans).

11.     As of December 31, 2021, after the merger of the Amentum Plan and DynCorp Plan, the Amentum Plan held over $1.63 billion in assets.

12.     Pre-merger, the Amentum Plan held between $283,155,602 and $838,257,947 in assets during years 2017, 2018, 2019, and 2020.

13.     Pre-merger, the DynCorp Plan held between $398,348,318.00 and $547,565,337.00 in assets during years 2017, 2018, 2019, and 2020.

14.     According to the Brightscope/ICI Defined Contribution Plan Profile report dated September 2022 (using 2019 data), each plan would independently place within the top 0.5% of all 401(k) plans based on plan assets.

15.     As some of the largest 401k plans in the United States, the Plans had (and in the case of the Amentum Plan continues to have) substantial bargaining power regarding the fees, expenses, and costs charged against participants' investments.

16.     During the Class Period, Defendants, as fiduciaries of the Plans, breached the duties they owed to the Plans, to Plaintiff, and to other participants and beneficiaries of both plans by failing to adequately monitor and control fees, expenses, and costs, allowing service providers to charge excessive fees, expenses, and costs.

17.     Defendants' mismanagement of the Plans cost the Plans and their participants millions of dollars.

18.     Plaintiffs bring this action to remedy the losses sustained as a result of Defendants' fiduciary breaches and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of ERISA.

19.      Plaintiffs assert claims against Defendants for breaching their fiduciary duties, as set forth below.

20. This Complaint is based upon known facts and reasonable inferences drawn from the facts as set forth herein.

### THE PARTIES

**Plaintiff**

21. Plaintiff Jay Middleton resides in Overland Park, Kansas.

22. Mr. Middleton was employed by DynCorp International LLC from 2003 to 2005 and participated in the DynCorp Plan.

23. After ending his employment with DynCorp, Plaintiff remained a participant in the DynCorp Plan.

24. When the DynCorp Plan and Amentum Plan merged effective December 31, 2021, Mr. Middleton's assets were transferred to the Amentum Plan.

25. Since December 31, 2021, Mr. Middleton has been and remains a participant in the Amentum Plan.

26. In the third quarter of 2022, Mr. Middleton was a participant in the Amentum Plan and was invested in the Vanguard Institutional Index Fund, one of the investment options offered by the Plan.

27. On information and belief, as of the fourth quarter of 2022, Defendants moved Mr. Middleton's investment into the Fidelity S&P 500 Index Fund.

28. Mr. Middleton has standing to bring this action because he previously participated in the DynCorp Plan, he is a current participant in the Amentum Plan, and he was personally injured in fact as a result of Defendants' breaches of their fiduciary duties as alleged in more detail below. Those injuries include but are not limited to monetary injury from the imprudent investment options offered to Plaintiff by the DynCorp Plan and the Amentum Plan, the overarching process

by which Defendants chose imprudent options for the Plan, the denial of the opportunity to invest in lower-cost alternative funds, and diminution of the value of Plaintiff's retirement assets.

29.     Plaintiff George A. Lawrence resides in Dilliner, Pennsylvania.

30.     Mr. Lawrence was employed by a firm that Amentum acquired in 2021.

31.     Mr. Lawrence was a participant in the Amentum Plan and made contributions to the Amentum Plan between 2019 and 2021.

32.     Mr. Lawrence remained a participant in the Amentum plan through at least 2021.

33.     Mr. Lawrence was invested in one of the T. Rowe Price target date funds offered as an investment option by the Plan.

34.     Mr. Lawrence has attempted to gather further records about his participation in the Amentum Plan from the pertinent recordkeeper, but it has not provided the requested records to Mr. Lawrence.

35.     Mr. Lawrence has standing to bring this action because he previously participated in the Amentum Plan and he was personally injured in fact as a result of Defendants' breaches of their fiduciary duties as alleged in more detail below. Those injuries include but are not limited to monetary injury from the imprudent investment options offered to Plaintiff by the Amentum Plan, the overarching process by which Defendants chose imprudent options for the Plan, the denial of the opportunity to invest in lower-cost alternative funds, and diminution of the value of Plaintiff's retirement assets.

**Defendants as Fiduciaries under ERISA**

36.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

37.     ERISA treats as fiduciaries not only persons expressly named as fiduciaries under 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

38.     Defendants are, or during the Class Period were, fiduciaries of the Plans under ERISA.

39.     Defendants are or were fiduciaries of the Plans because they were so named; they exercised authority or control respecting management or disposition of the Plans' assets; they exercised discretionary authority or discretionary control respecting management of the Plans; they had discretionary authority or discretionary responsibility in the administration of the Plans; and/or they acquired a fiduciary and thus its liability.

**The Corporate Defendants**

40.     Defendant Amentum Government Services Parent Holdings LLC ("Amentum") describes itself as a "premier leader in global engineering, project management, and solutions integration," and operates in 85 countries with 44,000 employees.[1]

41.     DynCorp International LLC ("DynCorp") was a provider of sophisticated aviation, logistics, training, intelligence and operational solutions in over 30 countries worldwide.[2]

42.     In November 2020, Amentum acquired DynCorp.

**Merger of the Plans**

43.     DynCorp was the sponsor and administrator of the DynCorp International Savings Plan (the "DynCorp Plan").

---

[1] AMENTUM, *A Premier Leader in Global Engineering, Project Management, and Solutions Integration*, https://www.amentum.com/ (last visited July 17, 2023).

[2] AMENTUM, *Amentum Closes DynCorp International Acquisition*, https://www.amentum.com/2020/11/16/amentum-closes-dyncorp-acquisition/ (Nov. 16, 2020).

8

44.     Amentum is the sponsor and administrator of the Amentum 401(k) Retirement Plan (the "Amentum Plan").

45.     After Amentum's November 2020 acquisition of DynCorp, the Amentum Plan and DynCorp Plan were merged into a single plan.

46.     The merger of the Amentum Plan and DynCorp became effective December 31, 2021.

47.     Through its acquisition of DynCorp, which served as the sponsor and administrator of the DynCorp Plan, Amentum is liable for DynCorp's breaches of the fiduciary duties owed to the DynCorp Plan and its participants and beneficiaries.

48.     DynCorp and its prior owners, officers, and agents who were fiduciaries of the DynCorp Plan remain liable for any and all breaches of ERISA's fiduciary duties that occurred during the time DynCorp was the sponsor and/or administrator and they were fiduciaries of the DynCorp Plan.

**The Administrative Committee Defendants**

49.     DynCorp delegated responsibility for administering the DynCorp Plan to the Retirement and Employee Benefit Plans Committee ("DynCorp Committee"), and that Committee had authority to and did appoint the individual members of the Committee.

50.     The DynCorp Committee was responsible for administering the DynCorp Plan and selecting and retaining prudent investment options for plan participants.

51.     Amentum delegated responsibility for administering the Amentum Plan to the Defendant Amentum Benefits Administration Committee ("ABAC").

52.     The ABAC was and is responsible for administering the Amentum Plan and selecting and retaining prudent investment options for plan participants.

53.     Upon information and belief, the ABAC formed the Amentum Retirement & Investment Committee ("ARIC") and delegated to that committee the responsibility for selection and retention of investment options for plan participants.

54.     At all relevant times, Amentum had the responsibility to oversee the ABAC and appoint and oversee its members, and Amentum and the ABAC had the responsibility to oversee the actions of the ARIC and appoint and oversee its members.

55.     Upon information and belief, at some point between Amentum's November 2020 acquisition of DynCorp and the December 31, 2021 merger of the Amentum Plan and DynCorp Plan, DynCorp delegated responsibility for administering the DynCorp Plan to the ABAC, after which that Committee had the authority to and did appoint the individual members of the DynCorp Committee and became responsible for administering the DynCorp Plan and selecting and retaining prudent investment options for plan participants..

**The Individual Defendants**

56.     Individual defendants Tammy Woodman and Barbara Dianne Walker were employees of DynCorp and among those who were appointed to serve on the DynCorp Plan's Retirement and Employee Benefit Plans Committee.[3]

57.     During her employment at DynCorp from October 2018 through November 2020, Woodman's job title was "401(k) & Compliance Principal."

---

[3] Plaintiff uses the committee name identified as the administrator for the DynCorp Plan in the DynCorp Plan's Form 5500s. In the event the Form 5500s misstate the name of the committee that serves as its administrator, the name used in this Complaint is intended and shall be deemed to refer to the DynCorp Plan's administrative committee by whatever other name(s) it is or has been known, including but not limited to the Retirement and Employee Benefit Plans Committee.

10

58. Following Amentum's November 2020 acquisition of DynCorp, Woodman became an employee of Amentum, where she held the same title, "401(k) & Compliance Principal," and was appointed to serve on the ABAC and the ARIC.

59. Woodman signed the 2021 Form 5500s for both the DynCorp Plan and Amentum Plan as plan administrator.

60. Walker worked for DynCorp as Senior VP of Human Resources and a member of DynCorp's Board of Directors, but Plaintiffs are unaware of the exact dates of her employment and service as a Director of DynCorp.

61. Walker signed or is listed as plan administrator on the DynCorp Plan's Form 5500s for the following years: 2017, 2018, 2019, and 2020.

62. Individual defendants Greg Robinson, Bob Rudisin, Debbie Bechtel, Angie Myers, Alice McAbee, and Matt Stone were employees of Amentum and were among those who were appointed to serve on the ABAC since the Committee's inception through at least December 31, 2022.

63. Rudisin worked for Amentum as Executive Vice President, Human Resources.

64. Bechtel worked for Amentum as a Controller.

65. Myers worked for Amentum as Benefits Manager.

66. McAbee worked for Amentum as Director of Global Benefits.

67. Stone worked for Amentum as Vice President of Corporate Finance and Controller.

68. Individual defendants Jake Kennedy, Larry Goldman, Ann McRitchie, Greg Robinson, Bob Rudisin, Tammy Woodman, Alice McAbee, and Matt Stone were employees of Amentum and were among those who were appointed to serve on the ARIC since the Committee's inception through at least December 31, 2022.

11

69. Kennedy worked for Amentum as Chief Financial Officer.

70. Goldman works for Amentum as Vice President and Treasurer.

71. McRitchie worked for Amentum as Contracts & Legal Operations Manager.

72. Defendants John and Jane Does 1–30 are the as-of-yet-unidentified individuals who are or were members of the ABAC, the ARIC, and/or the DynCorp Committee, as well as the other officers, employees, contractors, entities, and/or agents of the corporate Defendants who were fiduciaries of either Plan during the Class Period or are or were responsible for administering either of the Plans at any time during the Class Period. This necessarily includes, but is not limited to, those persons who were fiduciaries of the DynCorp Plan during the time DynCorp International LLC served as the plan administrator. As such, defendants John and Jane Does 1–30 are or were the individuals or part of the group that was delegated control over the management of the Plans and their assets, including selecting and regularly monitoring the Plans' investment options and the performance and costs of those options, comparing them to other better-performing or less-costly alternatives, choosing and overseeing the Plans' third-party administrator, custodian, trustee, recordkeeper, and other service providers, and monitoring the compensation and minimizing the costs of such third-party services.

**Defendants' Citizenship and Service Information**

73. Amentum is a privately held, Delaware limited liability company, headquartered in Chantilly, Virginia, and may be served through its registered agent, The Corporation Trust Company, at its registered office, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The ABAC and the ARIC may be served at this same address.

74. DynCorp, a Delaware corporation with its headquarters in McLean, Virginia, maintains active foreign business registrations in Texas, Kansas, and Virginia, and, according to

the Kansas Secretary of State's office, may be served in Kansas through its resident agent, CT Corporation System, at its registered office, 112 SW 7th Street, Suite 3C, Topeka, Kansas 66603. The DynCorp Committee may be served at this same address.

75.     Tammy Woodman resides in Texas and, upon information and belief, may be served at her residence located at 6213 Winter Park Drive, North Richland Hills, Texas 76180-5365.

76.     Barbara Dianne Walker resides in Texas and, upon information and belief, may be served at her residence located at 6700 Somerset Hills Court, Fort Worth, Texas 76132-5450.

77.     Greg Robinson resides in Maryland and, upon information and belief, may be served at his residence located at 11608 Settlers Circle, Germantown, MD 20876.

78.     Bob Rudisin resides in Virginia and, upon information and belief, may be served at his residence located at 8618 Groveland Drive, Springfield, VA 22153-2131.

79.     Debbie Bechtel resides in Maryland and, upon information and belief, may be served at her residence located at 2618 Manchester Road, Manchester, MD 21102.

80.     Angie Myers resides in Virginia and, upon information and belief, may be served at her residence located at 4250 Rangoon Pl, Dulles, VA 20189-4250.

81.     Alice McAbee resides in Texas and, upon information and belief, may be served at her residence located at 304 Meadowcreek Road, Coppell, TX 75019-4023.

82.     Matt Stone resides in Texas and may be served at his residence in Texas.

83.     Jake Kennedy resides in Hawaii and, upon information and belief, may be served at his residence located at 3880 Wyllie Road, Apt. 13A, Princeville, HI 96722-5515.

84.     Larry Goldman resides in Maryland and, upon information and belief, may be served at his residence located at 337 Booth Street, Gaithersburg, MD 20878-5476.

13

85.     Ann McRitchie resides in Maryland and, upon information and belief, may be served at her residence located at 4204 Great Oak Road, Rockville, MD 20853-1855.

<b><u>THE PLANS</u></b>

**The Amentum Plan**

86.     The Amentum 401(K) Retirement Plan ("Amentum Plan") is a defined contribution plan as defined by ERISA.

87.     Prior to February 1, 2020, the Amentum Plan was known as the AECOM 401(k) Retirement Plan for Specified Contract Employees, and the plan was sponsored by and administered by AECOM Global II, LLC.[4]

88.     On or around February 1, 2020, the plan was renamed the Amentum 401(K) Retirement Plan, and Amentum Government Services Parent Holdings LLC became the plan sponsor and administrator.

89.     Amentum remains the sponsor and administrator of the Amentum Plan.

**The DynCorp Plan**

90.     The DynCorp International Savings Plan ("DynCorp Plan") was a defined contribution plan as defined by ERISA.

91.     From January 1, 2017 through December 31, 2021, DynCorp was the sponsor and administrator of the DynCorp Plan.

---

[4] According to the Amentum Plan's form 5500 filed with the U.S. Department of Labor in 2020, on January 31, 2020, AECOM closed on the sale of its Management Services business, which included AECOM Global II, LLC. The resulting new company became Amentum Holdings, LLC, the parent of Amentum Government Services Parent Holdings LLC. As a result of the sale, participants in the AECOM 401(k) Retirement Plan for Specified Contract Employees transferred to Amentum. In conjunction with the sale, sponsorship and administration of the plan transferred to Amentum Government Services Parent Holdings LLC. The name of the plan changed to Amentum 401(k) Retirement Plan effective February 1, 2020.

92.     In November 2020, Amentum closed on its acquisition of DynCorp.

93.     Effective December 31, 2021, the DynCorp Plan was merged into the Amentum Plan.

## JURISDICTION AND VENUE

94.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

95.     This Court has personal jurisdiction over Defendants because they transact business in this District, have significant contacts with this District, and because ERISA provides for nationwide service of process.

96.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because some or all of the breaches and violations of ERISA alleged herein occurred in this District and Defendants may be found in this District.

97.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## ERISA'S FIDUCIARY STANDARDS

98.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty, prudence, diversification, and compliance with the plan document upon plan fiduciaries. 29 U.S.C. § 1104(a)(1).

99.     These fiduciary duties apply to Defendants because they are or were fiduciaries of the Plans during the Class Period.

15

100.    ERISA § 404(a)(1) imposes a "prudent person" standard of care on plan fiduciaries:

> [A] fiduciary shall discharge [her or his] duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)    for the exclusive purpose of:
>
> (i)    providing benefits to participants and their beneficiaries; and
>
> (ii)    defraying reasonable expenses of administering the plan;
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C.§ 1104(a)(1).

101.    ERISA also imposes co-fiduciary duties on plan fiduciaries under ERISA § 405, which states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

16

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105.

102.    Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments must act prudently and solely in the interest of participants and beneficiaries of the plan.

103.    Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings 401(k) Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

104.    Indeed, fiduciary decisions may dramatically affect the amount of money participants save for retirement.

105.    For example, an illustration from the Department of Labor shows that a 1% difference in fees over a person's career makes a 28% difference in retirement savings. *A Look at 401(k) Plan Fees* at 2.

106.    An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

107.    Prudence requires a review at "regular intervals." *Id.* at 529 (citations omitted).

108.    As the Department of Labor explains:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

109.     As the Supreme Court recently explained in *Hughes v. Northwestern University*, plan fiduciaries may not simply provide a menu of options, some of which are prudent, and rely "on the participants' ultimate choice" from that menu to excuse their imprudent decisions. 595 U.S. 170, 176 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* (citing *Tibble*, 575 U.S. at 529–30).

110.     In *Hughes*, the Supreme Court applied *Tibble* to the pleading standard for a wide range of alleged plan deficiencies, including allegations that fiduciaries "failed to monitor the Plans' investments in a number of ways, including … neglecting to provide cheaper and otherwise-identical alternative investments." *Hughes*, 142 S. Ct. at 741–42.

111.     The Supreme Court held that a failure to remove an imprudent investment option from a plan within a reasonable time is a fiduciary breach. *Id*.

112.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries, as the Department of Labor has explained:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

113.   In a separate publication, the Department of Labor further explains:

> The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan – referred to as fiduciaries – carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.
>
> . . . .
>
> Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.
>
> . . . .
>
> **Investment fees.** By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* 1–2 (Sept. 2021), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

### GENERAL ALLEGATIONS

### Background of the Plans

114.   The Plans are defined contribution plans within the meaning of ERISA.

115. A "defined contribution" or "individual account" plan is a type of retirement plan in which an individual account is set up for each participant, and benefits are based on the amounts contributed to those accounts (through employee contributions and, if applicable, employer contributions), and any income, expenses, gains, and losses.

116. Each participant directs plan contributions in his or her individual account into one or more investment alternatives in a lineup chosen by the plan's fiduciaries.

117. Participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of the contributions, less expenses.

118. Defendants selected and retained various investment options made available to participants in the Plans and chose the recordkeepers for the Plans.

119. At the choice and discretion of Defendants, various investment options were made available to participants in the Plans.

120. The fiduciaries have exclusive control over this menu of investment alternatives available to plan participants.

121. As the Plans' fiduciaries, Defendants must engage in a prudent and loyal process to select, monitor, remove, and retain the Plans' investment options.

122. ERISA's duty of prudence is a continuing one; that is, a fiduciary has a continuing duty (as opposed to a one-time duty) to monitor plan investments and remove imprudent ones.

123. As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must provide diversified investment options for the Plans. But diversification is not the only consideration for a prudent and loyal fiduciary. ERISA also requires Defendants to evaluate and monitor the fees and costs

associated with the Plans' investment options and to give substantial consideration to those fees and costs when determining which options to remove or retain.

124.    Each investment option has its own fees, typically expressed as a percentage of assets under management, or expense ratio. If, for example, a fund charges 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points. The fees deducted from an investment option reduce the value of the shares, and thus reduce the returns participants receive on their investments. These plan expenses can significantly reduce the value of an account in a defined-contribution plan.

125.    Thus, "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 843 F.3d at 1198.

126.    A fiduciary's failure to switch (or timely switch) to less expensive, substantially identical funds raises "plausible" "inferences of mismanagement" that the fiduciary either "failed to negotiate aggressively enough" or was simply "asleep at the wheel":

> The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the complaint alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence.

*Davis v. Wash. Univ.*, 960 F.3d 478, 483 (8th Cir. 2020).

127.    The fees assessed to 401(k) plan participants are generally attributable to two types of services: plan recordkeeping and investment management.

128.    The Plans' fiduciaries have control over these expenses.

21

129.    The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation.

130.    As a result of the foregoing, these fiduciary decisions have the potential to dramatically affect the amount of money plan participants are able to save for retirement, and fiduciaries must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees.

131.    A fiduciary's "duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule." Restatement (Third) of Trusts ch. 17 intro. note, Westlaw (May 2022); *see also Tibble*, 575 U.S. at 529–30 (relying on Restatement (Third) of Trusts to interpret ERISA).

132.    This duty to engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees is particularly true for the Plans in this case because they are very large plans with the bargaining power and leverage to negotiate for, and obtain, the lowest fees.

133.    Plan fiduciaries must be continually mindful of the types of investment options available to large 401(k) plans to ensure they do not unduly risk plan participants' savings or charge unreasonable fees.

134.     As the Department of Labor explains: "Plans with more total assets may be able to lower fees by using special funds or classes of stock in funds, which generally are sold to larger group investors. 'Retail' or 'brand name' funds, which are also marketed to individual and small group investors, . . . typically charge higher fees." *A Look at 401(k) Plan Fees* at 8.

135.    Based on the most recent data available to Plaintiff, even prior to the merger of the DynCorp Plan into the Amentum Plan on July 1, 2022, each Plan by itself was in the top 0.5% of

22

all 401(k) plans in terms of plan assets, making them two of the largest 401(k) plans in the United States.

136.   Because of the size of the Plans, their fiduciaries had access to investments options not generally available to smaller plans and significant bargaining power with respect to the fees and expenses that were charged against participants' investments.

137.   But, as described below, despite the size of the Plans, Defendants breached their fiduciary duties by failing to take (or timely take) advantage of this leverage and bargaining power, and failing to take (or timely take) appropriate actions to reduce the Plans' investment expenses, or filing to exercise appropriate judgment to scrutinize each investment option that was offered in the Plans during the Class Period to ensure it was prudent.

138.   Like plaintiffs in similar cases, Plaintiffs here did not have, and do not have, actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, such as Defendants' processes, and execution of such processes, for selecting, monitoring, reviewing, and removing investment options, or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

139.   Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed, including, among other things, the investment options that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of the Plans' investments versus available alternatives within

similarly sized plans, total cost comparisons to similarly sized plans, information regarding other available (and less expensive) share classes, and information regarding the availability and pricing of collective trusts and separate accounts. Having never managed large 401(k) plans such as the Plans, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans. Plaintiffs did not and could not review the meeting minutes or other evidence of Defendants' fiduciary decision-making process, or the lack thereof.

**The fiduciaries of the DynCorp Plan failed to administer the plan in a prudent manner.**

140.    Based upon the most recent data available to Plaintiffs, the DynCorp Plan had between $350 million and $550 million in assets and was in the top 0.5% of all 401(k) plans based on plan assets throughout the Class Period. For example, as of December 31, 2020, the DynCorp Plan had 11,108 participants, with $547,565,337 in total assets (approximately $474,164,642 of which were invested in mutual funds).[5]

141.    As described above, Defendants DynCorp International LLC, the DynCorp Committee, Tammy Woodman and Barbara Diane Walker, and all other as-of-yet unidentified "John and Jane Doe" individual defendants who served on the DynCorp Committee during the Class Period, were fiduciaries of the DynCorp Plan prior to the December 31, 2021 merger of the Plans, and, upon information and belief, Defendants Amentum Government Services Parent Holdings LLC, the ABAC, the ARIC, and Tammy Woodman, Greg Robinson, Bob Rudisin, Debbie Bechtel, Angie Myers, Alice McAbee, Matt Stone, Jake Kennedy, Larry Goldman, and Ann McRitchie became fiduciaries to the DynCorp Plan either before or upon the December 31, 2021 merger of the Plans.

---

[5] Dyncorp Form 5500, Schedule H, Part I, Line C13(b) (filed with the U.S. Dept. Labor, Dec. 31, 2020).

142. Based on alleged facts and the reasonable inferences regarding these facts, Defendants failed to administer the DynCorp Plan in a prudent manner, in violation of their fiduciary duties.

143. For example, Defendants did not adhere to standard fiduciary best practices to control the DynCorp Plan's costs when looking at certain aspects of the DynCorp Plan's administration, such as monitoring investment management fees for the DynCorp Plan's investments, resulting in many of the investment options during the Class Period being more expensive than comparable investment options found in similarly sized plans.

144. Retirement plan participants pay for the cost of the plan's investment options via each option's expense ratio, based on a percentage of assets. For example, an expense ratio of 0.77% means the participant will pay $7.70 annually for every $1,000 in assets. This expense ratio thus reduces the participant's return and the compounding effect of that return. Thus, prudent plan fiduciaries must consider the effect that expense ratios have on investment returns, as it is in the best interest of participants to do so.

145. Here, Defendants could not have engaged in a prudent process as it relates to the investment management fees charged to participants in the DynCorp Plan.

146. As explained below, Defendants failed to take advantage of lower cost investment vehicles that were otherwise substantially identical to those in the DynCorp Plan, such as collective trusts (also called "collective investment trusts" and "collective trust funds"); failed to take advantage of savings offered by lower cost share classes of mutual funds already in the DynCorp Plan; and failed to offer the DynCorp Plan's participants alternative investment options that were less costly and equally or better-performing.

147.    As a result of Defendants' systemic failure to properly investigate and select lower cost investment options for the DynCorp Plan's participants (as explained in detail below), a substantial portion of the menu of investment options was overpriced compared to the other options that prudent and loyal fiduciaries would have selected for the benefit of the DynCorp Plan and its participants (*e.g.*, lower price share classes of the same funds; lower price, substantially similar alternative investments; and lower price collective trust versions of substantially identical mutual funds).

148.    During years 2017, 2018, 2019, and 2020 of the Class Period, well over half of the investment options offered by the DynCorp Plan were overpriced.

149.    Had Defendants fulfilled their duties under ERISA and engaged in a prudent process to select, monitor, retain, and remove investment options from the DynCorp Plan, these failures would not have occurred.

150.    Defendants' actions were contrary to the actions of a reasonable fiduciary and cost the DynCorp Plan and its participants millions of dollars in excessive fees.

**The fiduciaries of the DynCorp Plan failed to replace the T. Rowe Price target date mutual funds with substantially identical, but much less expensive, collective trust versions of these same funds in the DynCorp Plan.**

151.    Target-date funds ("TDFs") are a class of funds that periodically rebalance asset class weights to optimize risk and returns for a predetermined time frame. The asset allocation of a target-date fund is typically designed to gradually shift to a more conservative profile over time so as to minimize risk when the target date approaches. Target-date funds offer investors the convenience of putting their investing activities on autopilot in one vehicle. Target-date funds usually mature in five-year intervals, such as 2035, 2040, and 2045.

152. Many mutual funds, including the T. Rowe Price target-date mutual funds in the DynCorp Plan, engage in a practice called revenue sharing. Revenue sharing is a practice that takes a portion of the investment-management fees collected through an expense ratio to pay for recordkeeping fees. As a general matter, expense ratios and revenue-sharing payments move together: the higher a given share class's expense ratio, the more the fund pays the recordkeeper in revenue sharing.

153. But it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the retail class investment were the same as the fees charged by an institutional class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs. Thus, fiduciaries should not "choose otherwise imprudent investments specifically take advantage of revenue sharing." *Tibble v. Edison Int'l*, No. 07-5359, 2017 WL 3523737, at *8 (C.D. Cal. Aug. 16, 2017).

154. Collective trusts are administered by banks or trust companies—which assemble a mix of assets such as stocks, bonds, and cash—and are not available to the general public. Collective trusts contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings. Collective trusts use a unitized structure, and the units are valued daily. Participants invested in collective trusts can track their investments' daily performance online.

155. Collective trusts are subject to regulation and oversight by the government, similar to mutual funds. Regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses.

156.   Unlike with mutual funds, many collective trust managers are fiduciaries and are subject to ERISA fiduciary standards. In other words, they must manage the collective trusts solely in the plan participants' interest, which is a benefit to plan participants.

157.   Collective trusts are also subject to state and federal banking regulations that provide comparable protections to the Investment Company Act.

158.   To state it another way, collective trusts are subject to robust regulations, but do not have to be registered with the Securities and Exchange Commission because, unlike mutual funds, they are not a retail product available to the general public.

159.   Collective trusts thus can have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs.

160.   Retirement plans have used alternatives to mutual funds, such as collective trusts, for decades, and fiduciaries of other large plans were prudently paying attention and using their scale to reduce costs by offering lower-cost collective trust versions of funds.

161.   As Morningstar noted in May 2018, target-date providers "commonly make their strategies available in a different vehicle, via a collective investment trust, or CIT. Collective investment trusts, which are designed for qualified institutional investors, typically cost less than mutual funds." *See* Morningstar, *2018 Target-Date Fund Landscape* 13 (May 7, 2018).

162.   Since at least 2017, the DynCorp Plan utilized a collective trust—the T. Rowe Price Stable Value Common Tr-E—as one of its investment options; however, the DynCorp Plan failed to offer other lower-cost collective trust options.

163.   In particular, even though the DynCorp Plan had enough assets in its T. Rowe Price target-date mutual funds to qualify for the lower-cost collective trust counterpart of such funds and could have offered the collective trust version, the DynCorp Plan's trustees imprudently failed to

28

take advantage of this opportunity to significantly reduce the fees charged to the Plan and its participants.

164.    The T. Rowe Price target-date mutual funds used by the DynCorp Plan were as much as 73% more expensive than the substantially identical collective trust fund version.

165.    The collective-trust-based T. Rowe Price Retirement Trust target-date series is a substantially identical investment—other than its lower cost—to the mutual-fund-based T. Rowe Price Retirement Fund target-date series.

166.    For example, in June 2019, Joseph F. Martel, a multi-asset portfolio specialist for T. Rowe Price, described T. Rowe Price's collective trust target-date series as having "the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay and underlying investments" as T. Rowe Price's mutual fund-based retirement funds target-date series. Robert Steyer, *CIT target-date assets surging as mutual funds hit by outflows*, Pensions & Investments (June 24, 2019).

167.    As indicated publicly by a representative of the investment manager T. Rowe Price, other than the lower cost, the collective investment version is a substantially identical investment to the mutual fund version in all material respects, including: (a) the same investment strategy— i.e., the "same . . . tactical allocation and overlay"; (b) the same investment objectives—i.e., the same "glidepath"; and (c) the same risk profiles—i.e., the "same . . . subasset-class exposure."

168.    In simple terms, Defendants failed to switch to an investment option that was the same investment in a different wrapper at a much lower price, a manifestation of Defendants' failure to prudently monitor the DynCorp Plan's investment options.

169.    From January 1, 2017, through at least December 31, 2021, the DynCorp Plan's T. Rowe Price target-date mutual funds were significantly more expensive than their substantially

29

identical collective trust counterparts.

170.    The following chart provides an example of how much more expensive the DynCorp Plan's (which merged into the Amentum Plan effective December 31, 2021) T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2021:

| T. Rowe Price Target Date Mutual Fund in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Retirement 2005 | 0.49% | T. Rowe Price Retirement 2005 Tr-F | 0.37% | 32% |
| T. Rowe Price Retirement 2010 | 0.49% | T. Rowe Price Retirement 2010 Tr-F | 0.37% | 32% |
| T. Rowe Price Retirement 2015 | 0.51% | T. Rowe Price Retirement 2015 Tr-F | 0.37% | 38% |
| T. Rowe Price Retirement 2020 | 0.53% | T. Rowe Price Retirement 2020 Tr-F | 0.37% | 43% |
| T. Rowe Price Retirement 2025 | 0.55% | T. Rowe Price Retirement 2025 Tr-F | 0.37% | 49% |
| T. Rowe Price Retirement 2030 | 0.58% | T. Rowe Price Retirement 2030 Tr-F | 0.37% | 57% |
| T. Rowe Price Retirement 2035 | 0.59% | T. Rowe Price Retirement 2035 Tr-F | 0.37% | 59% |
| T. Rowe Price Retirement 2040 | 0.60% | T. Rowe Price Retirement 2040 Tr-F | 0.37% | 62% |
| T. Rowe Price Retirement 2045 | 0.62% | T. Rowe Price Retirement 2045 Tr-F | 0.37% | 68% |
| T. Rowe Price Retirement 2050 | 0.63% | T. Rowe Price Retirement 2050 Tr-F | 0.37% | 70% |
| T. Rowe Price Retirement 2055 | 0.64% | T. Rowe Price Retirement 2055 Tr-F | 0.37% | 73% |
| T. Rowe Price Retirement 2060 | 0.64% | T. Rowe Price Retirement 2060 Tr-F | 0.37% | 73% |
| T. Rowe Price Retirement 2065 | 0.64% | T. Rowe Price Retirement 2065 Tr-F | 0.37% | 73% |

| T. Rowe Price Retirement Balanced | 0.49% | T. Rowe Price Retirement Balanced Tr-F | 0.37% | 32% |
|---|---|---|---|---|
| **Average** | **0.57%** | | **0.37%** | **54%** |

171.     The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2020:

| T. Rowe Price Target Date Mutual Fund in Plan | In-Plan Expense Ratio | Lower Cost T. Rowe Price Collective Trust | Lower Cost Collective Trust Expense Ratio | Percent Fee Excess |
|---|---|---|---|---|
| **T. Rowe Price Retirement 2005** | 0.52% | T. Rowe Price Retirement 2005 Tr-F | 0.43% | 21% |
| **T. Rowe Price Retirement 2010** | 0.52% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 21% |
| **T. Rowe Price Retirement 2015** | 0.55% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 28% |
| **T. Rowe Price Retirement 2020** | 0.57% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 33% |
| **T. Rowe Price Retirement 2025** | 0.61% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 42% |
| **T. Rowe Price Retirement 2030** | 0.64% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 49% |
| **T. Rowe Price Retirement 2035** | 0.67% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 56% |
| **T. Rowe Price Retirement 2040** | 0.69% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 60% |
| **T. Rowe Price Retirement 2045** | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2050** | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2055** | 0.71% | T. Rowe Price Retirement 2055 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2060** | 0.71% | T. Rowe Price Retirement 2060 Tr-F | 0.43% | 65% |

| | | | | |
|---|---|---|---|---|
| **T. Rowe Price Retirement Balanced** | 0.50% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 16% |
| **Average** | **0.62%** | | **0.43%** | **45%** |

172.   The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2019:

173.   The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price target-date mutual funds were than their substantially identical collective trust counterparts in 2018:

| **T. Rowe Price Target Date Mutual Fund in Plan** | **In-Plan Expense Ratio** | **Lower Cost T. Rowe Price Collective Trust** | **Lower Cost Collective Trust Expense Ratio** | **Percent Fee Excess** |
|---|---|---|---|---|
| **T. Rowe Price Retirement 2005** | 0.52% | T. Rowe Price Retirement 2005 Tr-F | 0.43% | 21% |
| **T. Rowe Price Retirement 2010** | 0.52% | T. Rowe Price Retirement 2010 Tr-F | 0.43% | 21% |
| **T. Rowe Price Retirement 2015** | 0.55% | T. Rowe Price Retirement 2015 Tr-F | 0.43% | 28% |
| **T. Rowe Price Retirement 2020** | 0.58% | T. Rowe Price Retirement 2020 Tr-F | 0.43% | 35% |
| **T. Rowe Price Retirement 2025** | 0.62% | T. Rowe Price Retirement 2025 Tr-F | 0.43% | 44% |
| **T. Rowe Price Retirement 2030** | 0.65% | T. Rowe Price Retirement 2030 Tr-F | 0.43% | 51% |
| **T. Rowe Price Retirement 2035** | 0.68% | T. Rowe Price Retirement 2035 Tr-F | 0.43% | 58% |
| **T. Rowe Price Retirement 2040** | 0.70% | T. Rowe Price Retirement 2040 Tr-F | 0.43% | 63% |
| **T. Rowe Price Retirement 2045** | 0.71% | T. Rowe Price Retirement 2045 Tr-F | 0.43% | 65% |

| | | | | |
|---|---|---|---|---|
| **T. Rowe Price Retirement 2050** | 0.71% | T. Rowe Price Retirement 2050 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2055** | 0.71% | T. Rowe Price Retirement 2055 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement 2060** | 0.71% | T. Rowe Price Retirement 2060 Tr-F | 0.43% | 65% |
| **T. Rowe Price Retirement Balanced** | 0.50% | T. Rowe Price Retirement Balanced Tr-F | 0.43% | 16% |
| **Average** | **0.63%** | | **0.43%** | **46%** |

174.    The expense ratios in the other years of the Class Period were similar to the examples for the years shown above.

175.    A prudent fiduciary conducting a prudent, impartial review of the DynCorp Plan's investments would have identified the collective trust option and transferred the DynCorp Plan's investments into the above-referenced collective trusts at the earliest opportunity.

176.    Defendants failed to take such action, thereby acting imprudently.

177.    Because the marketplace for retirement plans is competitive and the DynCorp Plan's pool of assets are large, it is plausible, and indeed reasonable, to infer that Defendants were asleep at the wheel or did not negotiate aggressively enough and are guilty of a failure of effort or competence and failure to act with the immediacy that ERISA requires.

178.    At all times during the Class Period, had Defendants utilized a prudent process and been properly discharging their duties for the exclusive benefit of the participants and allowing the participants to be charged only reasonable fees, Defendants would have known or should have known of the existence of the same T. Rowe Price target-date investment in the lower-cost collective trust offering and would therefore have promptly transferred the DynCorp Plan's funds into these lower cost versions of the same investment options.

179.    Moreover, Defendants not only failed to utilize the collective trust version of the T.

Rowe Price target-date funds, but also inexplicably included only the investor share class in the DynCorp Plan, instead of the cheaper, substantially identical, institutional share class of the funds.

180. Even in 2021, when the now $1.6 billion Amentum Plan finally switched from the Vanguard target-date mutual funds to the lower-cost Vanguard target-date collective trust counterparts, Defendants still neglected to swap out the DynCorp Plan's T. Rowe Price target-date mutual fund series in favor of the lower fee T. Rowe Price target-date collective trust series.

181. When the DynCorp Plan and Amentum Plan were merged effective December 31, 2021, Defendants retained the higher fee T. Rowe Price target-date mutual fund series rather than switching to the lower fee T. Rowe Price target-date collective trust series or mapping participants over to the other investment options in the plan such as the even-lower-fee Vanguard target date fund collective trust series.

182. Throughout the class period, even though they were managing a multi-million dollar plan that eventually had over $1 billion of plan assets, Defendants elected to allow participants to invest millions of dollars into higher-fee retail T. Rowe Price target date mutual fund products that had a low minimum investment of only $2,500 per fund so that almost anyone could use it.

183. Defendants, however, were not retail investors and had millions of dollars (not $2,500) with which to obtain lower fees. In short, Defendants were letting participants pay higher retail prices with their retirement dollars when they could have and should have leveraged the large pool of assets to allow participants to pay lower wholesale prices.

184. Failing to utilize the lower cost collective trust options in the DynCorp Plan shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

185.    As a result of Defendants' breach of their fiduciary duties, the DynCorp Plan and its participants incurred excessive investment fees, costing them millions of dollars.

**The fiduciaries of the DynCorp Plan failed to replace the higher fee T. Rowe Price mutual funds with substantially identical, but much less expensive, collective trust versions of these same funds in the DynCorp Plan.**

186.    In addition to failing to replace the higher fee T. Rowe Price target date mutual funds with their corresponding lower-cost collective trust version, the Defendants also failed to replace other mutual fund investments with substantially identical collective trust versions of those same funds.

187.    The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price single asset class mutual funds were than their substantially identical collective trust counterparts in 2021:

| In-Plan Mutual Fund Option | Expense Ratio | Lower Cost Collective Investment Trust | Expense Ratio | % Fee Excess |
| --- | --- | --- | --- | --- |
| T. Rowe Price Equity Income | 0.65% | T. Rowe Price Equity Income Tr-D | 0.52% | 25% |
| T. Rowe Price Growth Stock | 0.64% | T. Rowe Price Growth Stock Tr-A | 0.50% | 28% |

188.    The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price single asset class mutual funds were than their substantially identical collective trust counterparts in 2020:

| In-Plan Mutual Fund Option | Expense Ratio | Lower Cost Collective Investment Trust | Expense Ratio | % Fee Excess |
| --- | --- | --- | --- | --- |
| T. Rowe Price Equity Income | 0.64% | T. Rowe Price Equity Income Tr-D | 0.52% | 23% |
| T. Rowe Price Growth Stock | 0.65% | T. Rowe Price Growth Stock Tr-D | 0.52% | 25% |

189.    The following chart provides an example of how much more expensive the DynCorp Plan's T. Rowe Price single asset class mutual funds were than their substantially

identical collective trust counterparts in 2019:

| In-Plan Mutual Fund Option | Expense Ratio | Lower Cost Collective Investment Trust | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Equity Income | 0.64% | T. Rowe Price Equity Income Tr-D | 0.52% | 23% |
| T. Rowe Price Growth Stock | 0.65% | T. Rowe Price Growth Stock Tr-D | 0.52% | 25% |

190. The expense ratios in the other years of the Class Period preceding 2019 were similar to the examples for the years shown above.

191. Moreover, Defendants not only failed to utilize the collective trust version of these mutual funds, but also inexplicably failed to use the cheaper, substantially identical, institutional share class of these funds.

192. Failing to utilize the lower cost collective trust options (or lower cost institutional share classes) in the DynCorp Plan shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

**The fiduciaries of the DynCorp Plan failed to offer the lowest-cost share classes of the funds offered by the DynCorp Plan.**

193. The fiduciaries of the DynCorp Plan also failed to take advantage of lower-cost share classes of the investment options they already offered in the DynCorp Plan.

194. Larger asset balances in 401(k) plans lead to economies of scale and special pricing with mutual funds and other investment products.

195. For example, many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors with more expensive share classes generally targeted at smaller investors with less bargaining power, while lower cost shares are targeted at "institutional investors" with more assets (generally $1 million or more) and therefore greater bargaining power.

196.    Even if the DynCorp Plan did not have enough assets to qualify for institutional funds, however, minimum-investment requirements are routinely waived for large plans like the DynCorp Plan. *See, e.g.*, *Davis v. Wash. Univ.*, 960 F.3d 478, 483 (8th Cir. 2020) (noting "Vanguard offered lower-cost institutional shares, which have higher initial investment requirements," but that "[i]nstead of offering these shares across its entire lineup, however, it offered retail shares for other funds, even though minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans").

197.    Typically, there is no difference between share classes other than cost—*i.e.*, the funds hold substantially identical investments and have the same manager.

198.    Fiduciaries must consider the size and purchasing power of their plan in selecting share classes or alternative investments.

199.    It is a foundational investment management principle that an investor with a larger amount to invest can qualify or negotiate for lower fees.

200.    Large defined contribution plans, such as the DynCorp Plan, qualify for lower-cost share classes and alternative investments because of their size and purchasing power.

201.    Prudent fiduciaries will search for and select the lowest-priced share class available as quickly as possible.

202.    During the Class Period, the fiduciaries of the DynCorp Plan failed to offer the lowest-cost share class of the already in-plan mutual funds that were available to the DynCorp Plan.

203.    No reasonable, prudent justification exists for the Defendants' failure to offer the lowest-cost share class available.

204.    At all times during the Class Period, the fiduciaries of the DynCorp Plan knew or

37

should have known of the existence of cheaper share classes of the mutual funds offered in the DynCorp Plan and thus also should have promptly identified the prudence of transferring the DynCorp Plan's funds into the lower-cost share classes of said mutual funds.

205.   At all relevant times, the DynCorp Plan and the Amentum plan had sufficient assets to qualify for lower cost share plans or, as large plans, had sufficient bargaining power to negotiate a waiver to the relevant initial investment requirements.

206.   As demonstrated below, the Defendants failed to ensure that the DynCorp Plan and its participants were invested in the lowest-cost share class available for the DynCorp Plan's investment options and did not promptly switch to these lower-cost alternatives when they became available.

207.   The following chart provides an example of how much more expensive the funds in the DynCorp Plan were than their substantially identical, lower-cost counterparts (using 2021 expense ratios):

| In Plan Option | In-Plan Expense Ratio | Lower Cost Institutional Class Shares | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Vanguard Extended Market Index Admiral | 0.06% | Vanguard Extended Market Index Instl | 0.05% | 20% |
| Vanguard Institutional Index Fund | 0.04% | Vanguard Institutional Index Instl Plus | 0.02% | 100% |
| Vanguard Total Bond Market Index Adm | 0.05% | Vanguard Total Bond Market Index I | 0.04% | 25% |
| Fidelity Low-Priced Stock | 0.65% | Fidelity Low-Priced Stock K6 | 0.50% | 30% |

208. The following chart provides an example of how much more expensive the funds in the DynCorp Plan were than their substantially identical, lower-cost counterparts (using 2020 expense ratios):

| In Plan Option | In-Plan Expense Ratio | Lower Cost Institutional Class Shares | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| Vanguard Extended Market Index Admiral - combined assets | 0.06% | Vanguard Extended Market Index Instl | 0.05% | **20%** |
| Vanguard Total Bond Market Index Adm | .05% | Vanguard Total Bond Market Index Inst'l | 0.04% | **25%** |
| Fidelity Low-Priced Stock | 0.78% | Fidelity Low-Priced Stock K6 | .32% | **144%** |

209. No prudent, loyal reason exists for not having offered, or for not having switched and more promptly offered, the DynCorp Plan's participants lower-cost share classes of the same funds.

210. Had Defendants engaged in a prudent, loyal process to select, monitor, retain, and remove investment options from the DynCorp Plan, they would have utilized the lower-cost share classes of the mutual funds in the DynCorp Plan. Defendants' failures in this regard caused the DynCorp Plan and its participants to pay unnecessary fees.

211. Failing to move funds in the DynCorp Plan to available lower price share classes shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

**The fiduciaries of the DynCorp Plan selected and retained investment options that were more expensive than substantially similar and better-performing alternative investment options available to the DynCorp Plan.**

212.    The DynCorp Plan offered between 10 and 13 single asset class investment options during the Class Period.

213.    At least 4 of these single asset class investment options were more expensive, and in most cases considerably more expensive, than substantially similar and better performing alternative investment options available to the DynCorp Plan.

214.    These expensive funds, and examples of substantially similar lower-cost alternative investment options, are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of 2020, which is in the middle of the class period):

| In-Plan Option | Expense Ratio | Lower Cost Alternative Option(s) | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| T. Rowe Price Growth Stock Fund | 0.65% | TIAA-CREF Large-Cap Gr Index Instl | 0.05% | 1200% |
| | | Vanguard Mega Cap Growth Index Instl | 0.06% | 983% |
| Vanguard Institutional Index I (tracks S & P 500 Index) | 0.04% | Fidelity 500 Index (tracks S & P 500 Index) | 0.02% | 100% |
| T. Rowe Price Equity Income | 0.64% | Vanguard S&P 500 Value Index Instl | 0.08% | 700% |
| | | Vanguard Windsor Fund Admiral | 0.20% | 220% |

215.    The lower-cost investment option alternatives listed in the chart above performed comparably with or better than, and in some cases significantly better than, their comparable higher-cost option in the DynCorp Plan.

216.    The expense ratios for the in-plan and substantially similar alternative investment options in the other years of the Class Period were similar to the expense ratios shown above, which are provided simply as a specific illustration.

217. The substantially similar, but lower-cost, alternative investment options in the chart above were identified using an industry recognized software program that uses quantitative methods, such as returns-based and holdings-based correlation analysis, to find funds that are highly similar to the fund being analyzed, resulting in an apples-to-apples comparison. [6]

218. Prudent fiduciaries may also review information and analysis in other computerized databases to make sure that they are comparing "apples to apples." One prominent provider of investment information is Morningstar.

219. Morningstar is a billion-dollar company with more than 10,000 employees globally. Morningstar reports that it has covered 621,370 investments. *See* Morningstar, About Us, https://www.morningstar.com/company/about-us (last visited February 9, 2024).

220. Because Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested, Morningstar developed the Morningstar Category Classifications in 1996 for the express purpose of helping "investors make meaningful comparisons between mutual funds." *See* Morningstar, *The Morningstar Category Classifications* 7 (Apr. 29, 2016), *available at* https://morningstardirect.morningstar.com/clientcomm/Morningstar_Categories_US_April_2016 .pdf.

221. Morningstar Category classifications were developed by "breaking portfolios into peer groups based on their holdings. The categories help investors identify the top-performing

---

[6] This approach utilizes a quantitative analysis to find similar funds alternatives for funds in the plan. There are two key steps to this methodology. First, a returns-based correlation between the fund currently in the plan and other available investments. The returns of the funds and the alternatives must have a very high degree of correlation. Second, where available, by gathering position data from SEC filings and calculating a holdings-based correlation. Similarity is the average correlation between returns-based and holdings-based correlations. Only those funds with Similarity of >.90 are shown. Note that if holdings are not available, Similarity is based on returns-based correlation only.

funds assess potential risk and build well-diversified portfolios.  Morningstar regularly reviews the category structure and portfolios within each category to ensure that the system meets the needs of investors." *See id*.

222.    Morningstar Category data is used by computerized systems designed specifically to assist fiduciaries in complying with their fiduciary obligations under ERISA.

223.    For example, one such prominent system notes that it utilizes the Morningstar Category for peer group assignment because the Morningstar Category identifies funds based on their actual investment styles.

224.    In short, Morningstar Categories were developed so fiduciaries and other investors could utilize research generated by a systematic methodology to compare apples to apples.

225.    Applying the Morningstar Categories in this case results in the following:

| In-Plan Option | Category | Lower Cost Alternative Option(s) | Category |
|---|---|---|---|
| T. Rowe Price Growth Stock Fund | Large Growth | TIAA-CREF Large-Cap Gr Index Instl<br><br>Vanguard Mega Cap Growth Index Instl | Large Growth |
| Vanguard Institutional Index I (tracks S & P 500 Index) | Large Blend | Fidelity 500 Index (tracks S & P 500 Index) | Large Blend |
| T. Rowe Price Equity Income | Large Value | Vanguard S&P 500 Value Index Instl<br><br>Vanguard Windsor Fund Admiral | Large Value |

226.    Moreover, focusing specifically on the Vanguard Institutional Index, Defendants' own actions on or around September 30, 2022 to October 1, 2022 speak louder than any words and confirm that the Fidelity 500 Index was substantially similar to Vanguard Institutional Index.

42

227.    Prior to October 1, 2022, Mr. Middleton's Plan account held shares of the Vanguard Institutional Index.

228.    On Sept 30, 2022 Mr. Middleton's shares of Vanguard Institutional Index were sold, leaving him with no shares of the Vanguard Institutional Index.

229.    Mr. Middleton did not instruct the recordkeeper to sell shares of the Vanguard Institutional Index.    Rather, on information and belief, Defendants instructed the Plan's recordkeeper to sell Vanguard Institutional Index.

230.    On or around October 1, 2022, the exact amount of money generated by the sale of Mr. Middleton's shares of Vanguard Institutional Index was utilized to purchase shares of the Fidelity 500 Index.

231.    On information and belief, Defendants directed the Plan's recordkeeper to sell Vanguard Institutional Index and purchase Fidelity 500 Index, thus not only deeming Fidelity 500 Index substantially similar to Vanguard Institutional Index but also proving Plaintiff's allegations that a prudent fiduciary would replace the Vanguard Institutional Index with substantially similar lower cost better performing investments such as the Fidelity 500 Index.[7]

232.    In addition to the similar, but lower-cost, alternative investment options identified above by Plaintiff, not only did Defendants fail to lower fees in the DynCorp Plan by simply replacing the Vanguard Institutional Index with the lower-fee, better-performing Fidelity 500 Index, but also by failing to replace index funds from one investment company (Vanguard) with less expensive funds from another investment company (State Street).

233.    Index funds are a type of fund that tracks the returns of a particular market index.

---

[7] It appears that Vanguard Institutional Index also engages in securities lending as indicated by its Statement of Additional Information.  In fact, for the year ended December 31, 2022, the Vanguard Institutional Index Fund generated a net income from securities lending activities of $920,308.  *See* Vanguard Institutional Index Fund Prospectus, April 28, 2023.

234.    Market indexes measure the performance of a "basket" of securities, like stocks or bonds. This "basket" of securities is supposed to represent a sector of an economy or stock market. A person may invest in an index indirectly, through an index fund that tracks a market index.

235.    Generally, index funds are a passive style—meaning no fund manager is required—of investing, aiming to maximize returns over a long period of time by not buying and selling securities very often.

236.    Various investment companies may provide investment products that track the same index.  For example, well-known investment companies such as Vanguard, Fidelity, and State Street all offer investment products that track the S & P 500 Index. However, the price of these products, which track the exact same index, can vary by as much as 250%.

237.    Examples of substantially similar but lower-cost alternative index options are shown in the following chart, along with their applicable expense ratios (using, as an example, expense ratios as of May 2022):

| In-Plan Option | Expense Ratio | Lower Cost Alternative Option | Expense Ratio | % Excess Cost |
|---|---|---|---|---|
| Vanguard Institutional Index I (VINIX) | 0.035% | State Street S & P 500 Index II | 0.01% | 250% |
| Vanguard Total Bond Market Index I (VBTIX) | 0.04% | State Street U.S. Bond Index Fund | 0.02% | 100% |

238.    A prudent and loyal fiduciary would not have selected investment options that were significantly more expensive but performed no better (or worse) than substantially similar alternative investment options.

239.    No reasonable, prudent justification exists for Defendants' failure to offer these lower-cost alternatives.

**The fiduciaries of the Amentum Plan failed to timely replace the Vanguard target date mutual funds with substantially identical, but much less expensive, collective trust versions of these same funds in the Amentum Plan.**

240.    As previously alleged above, prior to February 1, 2020, the Amentum Plan was known as the AECOM 401(k) Retirement Plan for Specified Contract Employees ("AECOM SCE 401(k)"), and the plan was sponsored by and administered by AECOM Global II, LLC.

241.    While the AECOM SCE 401(k) only had $322 million as of 12/31/2019, because of AECOM Global II, LLC's aggregation of all its retirement plan assets in a master trust arrangement to leverage economies of scale, the participants had access to the ultra-low-cost Vanguard Target Date Trust Select Collective Investment Trust, which would have charged approximately 5 basis points (0.05%).  By comparison, the Vanguard Target Date Mutual Fund that was used by the Amentum Plan was 9 basis points, or approximately 80% more expensive.

242.    Thus, AECCOM Global II, LLC's action shows that other fiduciaries in circumstances then prevailing were prudently leveraging their assets to lower cost by using institutionally priced collective investment trusts target date strategies.

243.    On or around February 1, 2020, the plan was renamed the Amentum 401(K) Retirement Plan, and Amentum Government Services Parent Holdings LLC became the plan sponsor and administrator.  Therefore, when Amentum took over the plan in February 2020, it is virtually impossible for the Defendants charged with administering the Amentum Plan to fail to know how the assets were invested in low-cost Vanguard Target Date Trust collective investment trusts.

244.    Despite this, as well as having over $500 million in assets in the Vanguard Target Date strategy in 2020 which would have qualified the Amentum Plan for the Vanguard Target Date Trust 1 collective investment trust charging a fee of 7 basis points (0.07%), Defendants instead elected the Vanguard Target Date Mutual Fund charging a fee of 9 basis points (0.09%), which was 28% more expensive.

245.     Moreover, even if the Amentum Defendants were uncertain about the amount of assets that the Amentum Plan would ultimately have due to corporate and plan restructuring, minimum-investment requirements are routinely waived for large plans like the Amentum Plan. *See, e.g., Davis v. Wash. Univ.*, 960 F.3d 478, 483 (8th Cir. 2020) (noting "Vanguard offered lower-cost institutional shares, which have higher initial investment requirements," but that "[i]nstead of offering these shares across its entire lineup, however, it offered retail shares for other funds, even though minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans").

246.     Vanguard reports that the collective investment trust version of its target date strategy has an identical investment approach with the same glide path and target asset allocation and identical asset class coverage and industry-leading diversification obtained through lower-cost share classes and direct-invest trusts.

247.     Other than the lower cost, the collective investment version is a substantially identical investment to the mutual fund version in all material respects.

248.     Defendants, however, did not move to the Vanguard Target Date Trust 1 collective version until the end of 2021.

249.     In the meantime, Defendants' breach resulted in hundreds of thousands of dollars of damages to participant retirement accounts.

**The Amentum Plan included imprudent investment options at the time of and following the December 31, 2021 merger.**

250.     After the merger, the Amentum Plan held over $1.5 billion in assets with 21,754 participants.

251.     Despite the enormous size of the merged Amentum Plan, the fiduciaries of the Amentum Plan failed to administer the Amentum Plan in a prudent manner and failed to fulfill

46

their fiduciary duties regarding the Amentum Plan's investment options.

252. As described above, Amentum Government Services Parent Holdings LLC, the ABAC, the ARIC, Tammy Woodman, Greg Robinson, Bob Rudisin, Debbie Bechtel, Angie Myers, Alice McAbee, Matt Stone, Jake Kennedy, Larry Goldman, Ann McRitchie, and all other as-of-yet unidentified individuals who serve on the ABAC during the Class Period were fiduciaries of the Amentum Plan (the "Amentum Defendants").

253. First, upon merger of the Plans, the Amentum Defendants allowed the DynCorp Plan's investment options to migrate to the Amentum Plan, rather than removing those imprudent options identified above, including the T. Rowe Price target date mutual funds.

254. Second, as with the DynCorp Plan, the Amentum Defendants failed to replace mutual fund investments in the Amentum Plan with substantially identical collective trust versions of those same funds.

255. For example, the Amentum Defendants failed to replace the more-expensive Fidelity Growth Company Fund (at an 83-basis points expense ratio) with its less-expensive substantially identical collective trust counterpart, the Fidelity Growth Company Commingled Pool (at a 43-basis points expense ratio).

256. Furthermore, similar to the DynCorp Plan, the Amentum Defendants failed to take advantage of lower-cost share classes of the investment options they already offered in the Amentum Plan.

257. The following chart provides an example of how much more expensive the funds in the Amentum Plan are than their substantially identical, lower-cost counterparts (using 2021 expense ratios):

| In-Plan Option | In-Plan Expense Ratio | Lower Cost Institutional Class Shares | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds Europacific Growth A | 0.82% | American Funds Europacific Growth R6 | 0.46% | 78% |
| Fidelity Balanced | 0.51% | Fidelity Balanced K6 | 0.45% | 13% |
| Metropolitan West Total Return Bd M | 0.67% | Metropolitan West Total Return Bd I | 0.45% | 49% |
| Oakmark Investor | 0.91% | Oakmark R6 | 0.63% | 44% |
| T. Rowe Price Dividend Growth | 0.63% | T. Rowe Price Dividend Growth I | 0.5% | 26% |
| Vanguard Developed Markets Index Admiral | 0.07% | Vanguard Developed Markets Index Instl | 0.05% | 40% |
| Vanguard Explorer Inv | 0.41% | Vanguard Explorer Inv | 0.30% | 37% |
| Vanguard Extended Market Index Admiral | 0.06% | Vanguard Extended Market Index Instl | 0.05% | 20% |
| Vanguard Institutional Index I | 0.04% | Vanguard Institutional Index Instl Plus | 0.02% | 100% |
| Vanguard Total Bond Market Index Adm | 0.05% | Vanguard Total Bond Market Index I | 0.04% | 25% |

258.    At all times during the Class Period, the Amentum Defendants knew or should have known of the existence of cheaper share classes of the mutual funds offered in the Amentum Plan and thus also should have promptly identified the prudence of transferring the Amentum Plan's funds into the lower-cost share classes of said mutual funds.

259.    The Amentum Defendants failed to ensure that the Amentum Plan and its participants were invested in the lowest-cost share class available as an investment option and did not promptly switch to these lower-cost alternatives when they became available.

48

260. Defendants may claim their imprudent failures to timely replace target date mutual funds with much-less-expensive but substantially identical collective trust versions of these same funds, their imprudent failures to timely replace higher cost classes of mutual funds offered by the Plans with less-expensive share classes of these same mutual funds, and/or their imprudent failures to replace higher cost investment options with substantially similar but lower-cost and better-performing alternative investment options available to the Plans was justified by "revenue sharing." However, revenue sharing can be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, *Revenue Sharing and Invisible Fees*, CC Coaching & Consulting, https://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last accessed Feb. 7, 2024).

261. Courts have rejected such revenue sharing arguments and refused to consider revenue sharing as an offset to the excessive costs charged to Plans and their participants.

262. From 2019 through 2021, the DynCorp Plan's Form 5500s show that the DynCorp Plan engaged in revenue sharing. Those Form 5500s, however, do not describe the revenue-sharing arrangement that the DynCorp Plan used.

263. From 2017 to 2020, the DynCorp Plan's Form 5500s show that the DynCorp Plan received indirect compensation. As above, those Form 5500s do not describe the precise indirect-compensation arrangement that the DynCorp Plan used.

264. Any alleged revenue sharing did not and could not have made up for the additional costs that the Plans and their participants incurred through expensive funds. For example, Plaintiffs

conservatively estimate that in 2018, the DynCorp Plan and participants incurred at least $252,719 in excessive fees because of the higher cost share classes and mutual funds versus CITs alone. But that year the DynCorp Plan did not report any benefit from revenue sharing or otherwise indirect compensation.

265. Similarly, in 2019, Plaintiffs conservatively estimate that the DynCorp Plan and participants incurred at least $461,841 in excessive fees because of the higher cost share classes and mutual funds versus CITs alone. But that year the DynCorp Plan did not report any benefit from revenue sharing or otherwise indirect compensation.

266. In 2020, Plaintiffs conservatively estimate that the DynCorp Plan and participants incurred $554,854 in excessive fees because of the higher cost share classes and mutual funds versus CITs alone. But that year the DynCorp Plan only reported $134,070 in alleged benefit from revenue sharing arrangements, leaving $420,784 in excess expenses borne by the Plan and its participants.

267. In the same year, Plaintiffs conservatively estimate that the Amentum Plan incurred at least $629,870 in excessive fees because of the higher cost share classes and mutual funds versus CITs alone. But the Amentum Plan only reported $134,131 in benefit from revenue sharing arrangements, leaving $495,739 in excess expenses borne by the Plan and its participants.

268. In 2021, Plaintiffs conservatively estimate that the Amentum Plan incurred $1,288,486 in excessive fees because of the higher cost share classes and mutual funds versus CITs alone But that year the Amentum Plan did not report any benefit from revenue sharing arrangements or otherwise indirect compensation.

269. Defendants may also allege that they did not qualify for certain share classes or investment options as a defense to their imprudent failure to replace higher cost share classes of

50

investment options offered by the Plans with lower cost share classes or lower cost CIT versions of these same investment options. However, upon information and belief, these lower priced investment options were available to the Plans.

## CLASS ACTION ALLEGATIONS

270. In addition to bringing this action on behalf of the Plans, pursuant to ERISA, Plaintiffs also bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class identified as follows: All participants in and beneficiaries of the DynCorp Plan from the date six years before the filing of this Complaint through the December 31, 2021 merger of the DynCorp Plan into the Amentum Plan, and all participants in and beneficiaries of the Amentum Plan from the date six years before the filing of the Complaint to the present, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families (the "Class").

271. Certification of the Class is appropriate under Rule 23(a) and Rule 23(b)(1), (b)(2), and/or (b)(3).

272. The DynCorp Plan and Amentum Plan had thousands of participants, all of whom suffered from the imprudent investment options and excessive and improper fees alleged herein.

273. The number of Class members is so large that joinder of all its members is impracticable.

274. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual class members.

275. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plans and services for the Plans;

51

(b) Whether the investment decisions made by Defendants were prudent;

(c) Whether the investment decisions made by Defendants were solely in the interests of the Plans' participants and beneficiaries;

(d) Whether the defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plans were being managed in compliance with ERISA;

(e) Whether the Plans suffered losses as a result of Defendants' fiduciary breaches; and

(f) Whether Defendants' acts proximately caused losses to the Plans and, if so, the appropriate relief to which Plaintiff, on behalf of the Plans and the Class, is entitled.

276. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

277. Plaintiffs will fairly and adequately represent the Class and has retained counsel competent in the prosecution of ERISA class-action litigation.

278. Plaintiffs have no interests antagonistic to those of other members of the Class.

279. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

280. Plaintiffs have standing to bring this action on behalf of the Plans because he is a current participant in the Amentum Plan and previously participated in the DynCorp Plan before the merger, and he was injured by Defendants' unlawful conduct.

281. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of his account currently or as of the time the account was distributed, and what his account is or would have been worth but for Defendants' breaches of fiduciary duty as described

herein.

282.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system with respect to the resolution of the issues raised in this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. This case presents no unusual management difficulties.

283.    Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

284.    Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

285.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

286.    In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the

fair and efficient adjudication of this controversy.

**CLAIMS FOR RELIEF**

**First Claim for Relief: Breach of ERISA Fiduciary Duties as to the DynCorp Plan**

287.    Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if fully set forth herein.

288.    Defendants were fiduciaries of the DynCorp Plan within the meaning of 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the DynCorp Plan or disposition of the DynCorp Plan's assets. Amentum has assumed DynCorp's fiduciary liability by virtue of its acquisition of DynCorp.

289.    As the fiduciaries of the DynCorp Plan, Defendants breached their fiduciary duties to the DynCorp Plan and its participants and beneficiaries in multiple respects and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

290.    As detailed above, Defendants had fiduciary responsibilities with respect to selecting, monitoring, retaining, and removing investment options in the DynCorp Plan and minimizing fees.

291.    As detailed above, Defendants caused the DynCorp Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities and failed to leverage the size of the DynCorp Plan to minimize costs.

292.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the DynCorp Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the DynCorp Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

293.    By the conduct and omissions described above, Defendants failed to discharge their

54

duties with respect to the DynCorp Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

294.   Defendants knowingly participated in the breaches of each of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such defendant's own duties, and knew of the violations by the other of Defendants but failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

295.   Accordingly, each of the Defendants is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the DynCorp Plan and its participants have paid substantial excess investment management and other related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2).

296.   The DynCorp Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

297.   If Defendants had complied with their fiduciary obligations, then the DynCorp Plan would not have suffered these losses, and DynCorp Plan participants would have more money available to them for their retirement.

298.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the DynCorp Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches, and Plaintiff is entitled to equitable relief and other

appropriate relief for these Defendants' breaches as set forth in Plaintiff's Prayer for Relief.

**Second Claim for Relief: Breach of ERISA Fiduciary Duties as to the Amentum Plan**
**(against the Amentum Defendants)**

299.    Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if fully set forth herein.

300.    From January 1, 2022 through present, Amentum, the ABAC, the ARIC, Tammy Woodman, Greg Robinson, Bob Rudisin, Debbie Bechtel, Angie Myers, Alice McAbee, Matt Stone, Jake Kennedy, Larry Goldman, Ann McRitchie, and certain Amentum officers, employees, contractors, entities, and/or agents, were fiduciaries of the Amentum Plan within the meaning of 29 U.S.C. § 1002(21)(A) (ERISA § 3(21)(A)), in that they exercised discretionary authority or control over the administration and/or management of the Amentum Plan or disposition of the Amentum Plan's assets.

301.    As the fiduciaries of the Amentum Plan, the Amentum Defendants breached their fiduciary duties to the Amentum Plan and its participants and beneficiaries in multiple respects and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

302.    As detailed above, the Amentum Defendants had fiduciary responsibilities with respect to selecting, monitoring, retaining, and removing investment options in the Amentum Plan.

303.    As detailed above, the Amentum Defendants caused the Amentum Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, failed to leverage the size of the Amentum Plan to minimize costs, and failed to monitor and remove imprudent investment options, including the imprudent options that migrated from the DynCorp Plan as a result of the Plans' merger.

304.    By the conduct and omissions described above, the Amentum Defendants failed to

discharge their duties with respect to the Amentum Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Amentum Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

305.   By the conduct and omissions described above, the Amentum Defendants failed to discharge their duties with respect to the Amentum Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

306.   The Amentum Defendants knowingly participated in the breaches of each of the other of these Defendants, knowing that such acts were a breach, enabled the other of these Defendants to commit breaches by failing to lawfully discharge such defendant's own duties, and knew of the violations by the other of these Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

307.   Accordingly, each of the Amentum Defendants is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a). As a direct and proximate result of these breaches of fiduciary duties, the Amentum Plan and its participants have paid substantial excess investment management and other related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which these Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2).

308.   The Amentum Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

309.   If these Defendants had complied with their fiduciary obligations, then the

Amentum Plan would not have suffered these losses, and Amentum Plan participants would have more money available to them for their retirement.

310.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Amentum Defendants are liable to restore to the Amentum Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches, and Plaintiff is entitled to equitable relief and other appropriate relief for these Defendants' breaches as set forth in Plaintiff's Prayer for Relief.

### Third Claim for Relief: Failure to Adequately Monitor Other Fiduciaries as to the DynCorp Plan

311.     Plaintiffs reallege and incorporate by reference all other allegations in this Complaint as if fully set forth herein.

312.    Upon information and belief, DynCorp and Amentum (after its acquisition of DynCorp in November 2020) appointed and thus had a duty to monitor the DynCorp Committee to ensure that it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the DynCorp Plan in the event the relevant committee was not fulfilling those duties.

313.    In addition, as plan sponsors, DynCorp and Amentum, at different times during the Class Period, had a duty to monitor the DynCorp Committee and ensure it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the DynCorp Plan in the event the relevant committee was not fulfilling those duties.

314.    One or more of these Defendants had the authority and obligation to monitor the DynCorp Committee and were aware the DynCorp Committee had critical responsibilities as a fiduciary of the DynCorp Plan.

315.    One or more of these Defendants had a duty to ensure the DynCorp Committee

58

possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the DynCorp Plan's investments; and reported regularly to it or them.

316. Defendants breached their fiduciary monitoring duties by, *inter alia*, the following: (a) failing to monitor and evaluate the performance of the DynCorp Committee or have a system in place for doing so, standing idly by as the DynCorp Plan suffered significant losses as a result of the DynCorp Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the DynCorp Plan's investments were evaluated; and (c) failing to remove the DynCorp Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the DynCorp Plan, all to the detriment of the DynCorp Plan and the retirement savings of the DynCorp Plan's participants.

317. As a consequence of the foregoing breaches of the duty to monitor, the DynCorp Plan suffered millions of dollars of losses.

318. Had Defendants complied with their fiduciary obligations, the DynCorp Plan would not have suffered these losses, and participants of the DynCorp Plan would have had more money available to them for their retirement.

319. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the DynCorp Plan all losses caused by their failure to adequately monitor the DynCorp Committee, and Plaintiff is entitled to equitable relief and other appropriate relief as set forth in Plaintiff's Prayer for Relief.

### Fourth Claim for Relief: Failure to Adequately Monitor Other Fiduciaries as to the Amentum Plan (against the Amentum Defendants)

320. Plaintiffs reallege and incorporate by reference all other allegations in this

Complaint as if fully set forth herein.

321. Upon information and belief, Amentum appointed and thus had a duty to monitor the ABACand ensure it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Amentum Plan in the event the ABAC was not fulfilling those duties.

322. Upon information and belief, the ABAC appointed and thus had a duty to monitor the ARIC and ensure it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Amentum Plan in the event the ARIC was not fulfilling those duties.

323. In addition, as plan sponsor, Amentum had a duty to monitor the ABAC and the ARIC and ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Amentum Plan in the event the ABAC and the ARIC were not fulfilling those duties.

324. Amentum had the authority and obligation to monitor the ABAC and was aware the ABAC had critical responsibilities as a fiduciary of the Amentum Plan.

325. The ABAC in turn had the authority and obligation to monitor the ARIC and was aware the ARIC had critical responsibilities as a fiduciary of the Amentum Plan.

326. Amentum had a duty to ensure the ABAC possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Amentum Plan's investments; and reported regularly to it or them.

327. The ABAC in turn had a duty to ensure the ARIC possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and

information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Amentum Plan's investments; and reported regularly to it or them.

328.    The Amentum Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the ABAC and the ARIC or have a system in place for doing so, standing idly by as the Amentum Plan suffered significant losses as a result of the ABAC and the ARIC's imprudent actions and omissions; (b) failing to monitor the processes by which the Amentum Plan's investments were evaluated; and (c) failing to remove the ABAC and the ARIC as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Amentum Plan, and caused the Amentum Plan to pay excessive recordkeeping fees, all to the detriment of the Amentum Plan and the retirement savings of the Amentum Plan's participants.

329.    As a consequence of the foregoing breaches of the duty to monitor, the Amentum Plan suffered millions of dollars of losses.

330.    Had Defendants complied with their fiduciary obligations, the Amentum Plan would not have suffered these losses, and participants of the Amentum Plan would have had more money available to them for their retirement.

331.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Amentum Plan all losses caused by its failure to adequately monitor the ABAC and the ARIC, and Plaintiff is entitled to equitable relief and other appropriate relief as set forth in Plaintiff's Prayer for Relief.

## PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

(a)      A determination that Plaintiffs may proceed on behalf of the Amentum Plan and DynCorp Plan, in accordance with ERISA;

(b)      A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

(c)      Designation of Plaintiff as Class Representative, and designation of Plaintiff's counsel as Class Counsel;

(d)      An order certifying the proposed Class;

(e)      A declaration that Defendants, and each of them, have breached their fiduciary duties under ERISA;

(f)      An order compelling Defendants to make good to the Amentum Plan and DynCorp Plan all losses resulting from Defendants' breaches of their fiduciary duties as outlined herein, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits that the participants would have made if Defendants had fulfilled their fiduciary obligations;

(g)      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(h)      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(i)      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or

62

fiduciaries to run the Plans and removal of the Plans' fiduciaries deemed to have breached their fiduciary duties;

       (j)      An award of pre-judgment interest;

       (k)      An award of costs pursuant to 29 U.S.C. § 1132(g);

       (l)      A service award to the class representatives;

       (m)      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

       (n)      Such other and further relief as the Court deems equitable and just.

### DESIGNATION OF PLACE OF TRIAL

Plaintiffs designate Kansas City, Kansas, as the place of trial of this cause of action.

Respectfully submitted by,

*/s/  Scott C. Nehrbass*

Scott C. Nehrbass, KS #16285
FOULSTON SIEFKIN LLP
7500 College Blvd. Suite 1400
Overland Park, KS 66210-4041
(P) 913.253.2144 | (F) 913.498.2101
snehrbass@foulston.com

Boyd A. Byers, KS #16253
Emily L. Matta, KS #28596
FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, Kansas 67206-4466
(P) 316.291.9716 | (F) 316.771.6011
bbyers@foulston.com
ematta@foulston.com

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

*/s/ Scott C. Nehrbass*
Scott C. Nehrbass, KS #16285