## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JAY MIDDLETON and GEORGE
LAWRENCE, individually and on behalf of
the AMENTUM 401(K) RETIREMENT
PLAN and DYNCORP INTERNATIONAL
SAVINGS PLAN, and all others similarly
situated,

　　　　　　　*Plaintiff*,

v.

　　　　　　　　　　　　　　　　　　Case No. 23-CV-2456-EFM-BGS

AMENTUM PARENT HOLDINGS, LLC,
DYNCORP INTERNATIONAL, LLC, *et al.*,

　　　　　　　*Defendants*.

## MEMORANDUM AND ORDER

Plaintiffs Jay Middleton and George A. Lawrence, on behalf of the Amentum 401(k)

Retirement Plan (the "Amentum Plan") and the DynCorp International Savings Plan (the "DI

Plan") (collectively the "Plans"), themselves, and all others similarly situated, bring this class

action under the Employee Retirement Income Security Act of 1974 ("ERISA"). On December

31, 2021, the DI Plan merged into the Amentum Plan. Plaintiffs assert 10 claims against numerous

Defendants (the fiduciaries of the Plans), including (1) breach of the fiduciary duty of prudence

(Counts I, II); (2) breach of the fiduciary duty of loyalty (Count V, VI); (3) violation of prohibited

transactions under 29 U.S.C. § 1106(a)(1) (Counts VII, VIII); (4) violation of ERISA's anti-

inurement provision (Counts IX, X); and (5) failure to adequately monitor other fiduciaries

(Counts III, IV). This matter comes before the Court on Defendants' Motion to Dismiss (Doc. 71). For the reasons stated below, the Court grants in part and denies in part Defendants' motion.

## I.     Factual and Procedural Background[1]

This case arises out of Defendants' administration of two defined-contribution retirement plans. Defendant DynCorp International, LLC ("DI") was a provider of sophisticated aviation, logistics, training, intelligence and operational solutions in over 30 countries worldwide. Defendant Amentum Parent Holdings, LLC ("Amentum") is a "premier leader in global engineering, project management, and solutions integration" and employs 44,000 employees in 85 countries. In November 2020, Amentum acquired DI. The DI Plan and the Amentum Plan existed separately and were administered by separate fiduciaries until the merger of the two plans became effective December 31, 2021. The Court will refer to the Amentum Plan pre-merger as the Legacy Amentum Plan, and it will refer to the merged DI and Legacy Amentum Plans as the Post-Merger Amentum Plan.

Plaintiff Middleton worked for DI from 2003 to 2005 and participated in the DI Plan. After ending his employment with DI, he remained a participant in the DI Plan. When the DI and Amentum Plans merged in 2021, Middleton's assets were transferred to the Post-Merger Amentum Plan, and he became a participant in the Post-Merger Amentum Plan. Middleton remains a participant in this plan.

Plaintiff Lawrence was employed by a firm that Amentum acquired in 2021. He was a participant in the Legacy Amentum Plan beginning in the second quarter of 2021, and he made contributions in 2021. He remained a participant in the Legacy Amentum Plan through the fourth quarter of 2021. Lawrence no longer participates in the plan.

---

[1] The following facts are taken from Plaintiffs' Third Amended Complaint ("TAC").

Defendants are the corporate entities (DI and Amentum) that sponsored the Plans, the committees that administered the Plans (the Retirement and Employee Benefit Plans Committee ("DI Committee"), the Amentum Benefits Administration Committee ("ABAC"), and the Amentum Retirement & Investment Committee ("ARIC")), and the individual members that made up Defendants' respective committees.[2]

Highly summarized,[3] Plaintiffs allege that the DI Plan (a defined contribution plan as defined by ERISA) had between $350 million and $550 million in assets. As of December 31, 2020, the DI Plan had 11,108 participants and $547,565,337 in total assets (approximately $474,164,642 of which were invested in mutual funds). Plaintiffs assert that Defendants had substantial bargaining power and failed to leverage this power to offer less expensive investment options that were identical to or substantially the same as the investment options in the DI Plan. In addition, they allege that Defendants failed to move DI Plan assets into substantially the same, but less expensive, options.

Plaintiffs also allege that DI assets are held in trust and that the DI Plan was funded by a combination of wage contributions from employees and company contributions from the Plan sponsor or affiliates. Forfeitures arise when contributions are made to a participant's account, but the participant terminates employment with the company sponsoring the plan before the participant is 100% vested. Plaintiffs allege that the DI Plan had forfeitures that could have been used to pay administrative expenses, but Defendants instead improperly applied the forfeitures to reduce the company's own contributions.

---

[2] Plaintiffs name 11 members and also include John and Jane Does 1-30.

[3] The Court will discuss the specific allegations as to both the DI and Amentum Plans in greater detail below when considering Plaintiffs' claims.

Plaintiffs allege that the Legacy Amentum Plan (a defined contribution plan as defined by ERISA) had $322 million as of December 31, 2019. They assert that the Legacy Amentum Plan included imprudent investment options at the time of the December 31, 2021 merger. After the merger of the Legacy Amentum Plan and the DI Plan, the Post-Merger Amentum Plan held over $1.63 billion in assets and had 21,754 participants. Plaintiffs allege that the Post-Merger Amentum Plan had imprudent investments that migrated into it from either the DI Plan or the Legacy Amentum Plan, and the fiduciaries failed to administer it in a prudent manner and failed to fulfill their fiduciary duties. In addition, Plaintiffs allege that there were forfeitures in the Amentum Plan in both 2021 and 2022 (approximately $870,000 from 2021 through 2022) that were improperly used.

Plaintiffs bring 10 claims: (1) breach of fiduciary duty to select, monitor, retain, and remove investment options and failure to engage in a reasoned and impartial decision-making process with regard to forfeited funds as to the DI Plan; (2) breach of fiduciary duty to select, monitor, retain, and remove investment options and failure to engage in a reasoned and impartial decision-making process with regard to forfeited funds as to the Legacy and Post-Merger Amentum Plan; (3) failure to monitor other fiduciaries (as to the investment options and forfeited funds) of the DI Plan; (4) failure to monitor other fiduciaries (as to the investment options and forfeited funds) of the Legacy and Post-Merger Amentum Plan; (5) breach of fiduciary duty of loyalty in the use of forfeited funds as to the DI Plan; (6) breach of fiduciary duty of loyalty in the use of forfeited funds as to the Amentum Plan;[4] (7) prohibited transactions by the use of forfeited funds as to the DI Plan; (8) prohibited transactions by the use of forfeited funds as to the Amentum

_____

[4] Plaintiffs do not differentiate between the Legacy and/or the Post-Merger Amentum Plan in these allegations. The Legacy Amentum Plan was in effect in 2021, and the Post-Merger Amentum Plan was in effect in 2022.

Plan; (9) breach of ERISA's anti-inurement provision by the use of forfeited funds as to the DI Plan; and (10) breach of ERISA's anti-inurement provision by the use of forfeited funds as to the Amentum Plan.

Plaintiffs also bring this suit as a class action pursuant to Fed. R. Civ. P. 23. Although class certification has not yet occurred, Plaintiffs propose that the class includes all participants and beneficiaries of the DI Plan from the date six years before the filing of the original Complaint (October 10, 2023) through the December 31, 2021 merger into the Amentum Plan, and all participants and beneficiaries of the Amentum Plan (Legacy Amentum Plan and Post-Merger Amentum Plan) from the date six years before the filing of the original Complaint to the present.

Defendants have now filed a Motion to Dismiss the Third Amended Complaint asserting that Plaintiffs fail to state a claim.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[5] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[6] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[7] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[8] Under Rule

---

[5] Fed. R. Civ. P. 12(b)(6).

[6] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[7] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[8] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[9] Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[10] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[11]

Although the Court generally does not consider documents outside the complaint on a motion to dismiss, there are some exceptions.[12] Specifically, the Court can consider "(1) documents that the complaint incorporates by reference, (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, and (3) matters of which a court may take judicial notice."[13] Defendants included 30 exhibits, totaling approximately 730 pages, with their motion. These exhibits include Forms 5500 and 497K (Exhibits 1 through 20, 22); DI Plan's November 2021 Plan and Investment Disclosure (Exhibit 21); Vanguard's and Fidelity's 2023 Statements of Additional Information (Exhibits 23, 24); Excerpts of DI and Amentum Plans (Exhibits 25 through 29); and a Southern District of California Order (Exhibit 30). Plaintiffs do not dispute the authenticity of these documents or the

---

[9] *Iqbal*, 556 U.S. at 678–79.

[10] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[11] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[12] *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2024) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).

[13] *Id.* (internal quotation marks and citation omitted).

relevance to Defendants' motion. Accordingly, the Court considered these documents in making its determination on Defendants' Motion to Dismiss.[14]

### III.    Analysis

Plaintiffs have two types of claims against both the DI Plan and the Amentum Plan—investment and forfeiture. With regard to the investment claims, Plaintiffs allege that Defendants breached their fiduciary duty of prudence (Counts I and II), and that DI and Amentum had a duty to monitor other fiduciaries and failed to do so (Counts III and VI). As to the forfeiture claims, Plaintiffs allege that Defendants breached their fiduciary duty of prudence (Counts I and II), breached their fiduciary duty of loyalty (Counts V and VI), and failed to monitor other fiduciaries (Counts III and IV). Plaintiffs also contend that the forfeitures were prohibited transactions (Counts VII and VIII) and violated ERISA's anti-inurement provision (Counts IX and X). The Court will first address the investment allegations, then the forfeiture allegations, and then Plaintiffs' failure to monitor claims.

### A.    Investment Claims (Counts I and II)

ERISA requires that a plan fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."[15] This requirement means that a fiduciary must "exercise a duty of prudence in operating and managing plans on behalf of participants."[16] "[A] plan fiduciary must select prudent investments from the beginning and has a 'continuing responsibility for oversight

---

[14] As will be noted below, the documents sometimes failed to support Defendants' contention, and thus to the extent the document did not support the contention, the Court did not rely on the document.

[15] 29 U.S.C. § 1104(a)(1)(B).

[16] *Matney*, 80 F.4th at 1148.

of the suitability of the investments already made.'"[17] "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones."[18] The duty of prudence is context specific, and "[w]hen assessing a duty of prudence claim at the pleading stage, courts must engage in 'careful, context-sensitive scrutiny of a complaint's allegations' in order to 'divide the plausible sheep from the meritless goats.'"[19]

A claim for a breach of the duty of prudence "can be based on allegations that the fees associated with the defined-contribution plan are too high compared to available, cheaper options."[20] "[T]o raise an inference of imprudence through price disparity, a plaintiff has the burden to allege a 'meaningful benchmark.'"[21] When comparing investment management fees, some relevant factors may be that "the alternative investment options have similar investment strategies, similar investment objectives, or similar risk profiles to the plan's funds."[22] "A court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists; rather, the complaint must state facts to show the funds or services being compared are, indeed, comparable."[23] In sum, to support a claim for a breach of the fiduciary duty of prudence, there must be sufficient facts in the complaint to show that the comparator fund is a "meaningful benchmark."[24]

---

[17] *Id.* at 1146 (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)).

[18] *Tibble*, 575 U.S. at 530.

[19] *Matney*, 80 F.4th at 1146 (quoting *Fifth Third Bank v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)).

[20] *Id.* at 1148.

[21] *Id.* (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).

[22] *Id.* (citing *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022) and *Meiners*, 898 F.3d at 823).

[23] *Id.* at 1149.

[24] *Id.* at 1152.

  1.  *DI Plan (Count I)*

  Plaintiffs contend that Defendants breached their fiduciary duties to the DI Plan and its participants by failing to engage in a prudent process to select, monitor, retain, and remove investment options.[25] There are four categories of investments at issue. Specifically, Plaintiffs assert that Defendants (1) failed to utilize the lowest-cost share class versions of several of the funds offered by the Plan; (2) failed to replace certain T. Rowe Price mutual funds with substantially identical, but much less expensive, collective investment trust ("CIT") versions of the same funds; (3) selected and retained high-cost, single asset investment options that were more expensive than substantially similar alternative options; and (4) failed to replace index funds with less expensive versions of funds that track the same index. The Court will address each investment category.

  a.  Less Expensive Share Classes

  Plaintiffs allege that the DI fiduciaries breached their duty of prudence by failing to include less expensive, substantially identical institutional-share classes of investments rather than more expensive, retail-share classes. In addition, Plaintiffs allege that due to the size of the DI Plan, it had sufficient assets to qualify for the lower cost share plans. Plaintiffs also assert that even if the DI Plan did not have enough assets to qualify for institutional-share funds, it had sufficient bargaining power to negotiate a waiver to the initial investment requirements.

  Defendants first assert that Plaintiffs fail to state a claim because they merely allege that cheaper institutional funds existed. The Court disagrees. Plaintiffs identify, by name, at least four less expensive institutional-share funds as compared to other more expensive retail-share funds

---

[25] Plaintiffs also allege that Defendants breached their fiduciary duty of prudence by failing to engage in a reasoned and impartial decision-making process with regard to the use of forfeited funds. This claim, as it relates to the forfeited funds, will be discussed below.

that existed in 2020 and 2021. Plaintiffs also allege that typically there is no difference between institutional share classes and retail share classes, other than cost, because the funds hold substantially identical investments and have the same manager.

Defendants next argue that Plaintiffs only make conclusory allegations with no factual support that the DI Plan qualified for institutional-share funds. Yet, as noted above, Plaintiffs identify, by name, four cheaper institutional-share funds that they compare to higher priced retail-share funds. In addition, they allege that Defendants qualified for the funds or had the ability to negotiate a waiver. At this point, it is a factual issue as to whether Defendants would or would not qualify for the institutional-share funds.[26]

Defendants' primary argument is that documents show that the DI Plan did not offer two of the four allegedly imprudent funds in 2017 and 2018.[27] In addition, Defendants state that even when these two allegedly imprudent funds were offered in 2019, 2020, and 2021, Defendants were unable to offer the proposed alternative cheaper and prudent funds because it did not meet the $5 million minimum investment amount.[28] Yet, Defendants' argument that it did not offer the imprudent funds in 2017 and 2018 does not address the allegations in the TAC as Plaintiffs' allegations reference 2020 and 2021. In addition, as Defendants concede, the DI Plan reached the $5 million investment threshold by December 31, 2020, and the DI Plan switched both of the allegedly imprudent funds to the allegedly cheaper, prudent funds in November 2021—

---

[26] *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) (finding that there was a reasonable inference at the motion to dismiss stage that the plan "failed to exploit the advantages of being a large retirement plan that could use scale to provide substantial benefits to its participants" and possibly violated its duty of prudence when there were allegations that the plan offered "pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional shares of the same funds to other retirement plans.").

[27] These funds are the Vanguard Extended Market Index Admiral Fund and the Vanguard Total Bond Market Index Admiral Fund.

[28] The alternative funds are the Vanguard Extended Market Index Institutional Fund and the Vanguard Total Bond Market Index Institutional Fund.

approximately one year later. The fact that Defendants' documents show that the DI Plan reached the investment threshold by the end of 2020 supports Plaintiffs' allegations that the DI Plan qualified for the institutional-share class funds. Furthermore, Plaintiffs allege that due to the size of the DI Plan, Defendants had sufficient bargaining power to request a waiver of the $5 million minimum threshold. Finally, the Court notes that Defendants do not specifically address two of the other identified funds in the TAC, and thus Defendants presumably concede that there are adequate allegations that these funds were offered in the DI Plan and/or the DI Plan qualified for these cheaper institutional-share funds.[29] Accordingly, Plaintiffs state a claim as to the less expensive institutional share classes.[30]

          b.        Collective Investment Trust ("CIT") Funds

Plaintiffs also allege that Defendants breached their duty of prudence by failing to switch their high-cost, mutual-fund based target-date funds ("TDFs")[31] to the same provider's less expensive, CIT-based TDFs.[32] Specifically, Plaintiffs set forth graphs comparing the DI Plan's T. Rowe Price target-date mutual funds with the lower cost T. Rowe Price target-date CIT funds. Plaintiffs allege that the T. Rowe Price target-date mutual funds and target-date CIT funds were similar because they had the same investment strategy, the same investment objectives, and the

---

[29] These funds are the Vanguard Institutional Index Fund and the Fidelity Low-Priced Stock Fund.

[30] Defendants also argue that Plaintiffs' allegation that Defendants could have negotiated a waiver of the minimum investment threshold is speculative. Because the Court already concluded that there are sufficient allegations that Defendants met the threshold by the end of 2020, it is unnecessary to address this argument at this time.

[31] The TAC alleges that TDFs are a class of funds that periodically rebalance asset class weights to optimize risk and returns for a predetermined time frame. These funds typically become more conservative over time, and they usually mature in five-year intervals.

[32] The TAC alleges that collective trusts can have lower costs than mutual funds because they are not a retail product available to the public and designed for institutional investors. A CIT fund is a collective trust version of a mutual fund.

same risk profiles. Defendants assert that Plaintiffs' conclusory allegations do not establish that a meaningful comparison can be made between the mutual-fund TDFs and the CIT-based TDFs.

Generally, as Defendants note, there are substantive differences between CITs and mutual funds making them difficult to compare.[33] Yet, the Tenth Circuit explicitly rejected "the notion that CITs could *never* be considered comparable to mutual funds."[34] Instead, the Tenth Circuit stated that it is a context specific inquiry.[35] Factual allegations that simply allege that CITs cost less than mutual funds and provide "no information about the goals or strategies of the various mutual funds or the CITs so as to establish their comparability" are insufficient to establish a meaningful comparison.[36]

Here, Plaintiffs allege more than simple cost comparisons. Plaintiffs assert that a fund manager for T. Rowe Price described its target-date CITs as having "the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay and underlying investments" as its target-date mutual funds. And, as noted above, Plaintiffs allege the two types of funds were similar because they had the same investment strategy, the same investment objectives, and the same risk profiles. Indeed, in a similar case in the District of Kansas, Judge Lungstrum stated that because the plaintiff "specifically alleged that the CITs were not materially different from their mutual fund counterparts . . . the Court is persuaded the aptness of that

---

[33] *See Tobias v. NVIDIA Corp.*, 2021 WL 4148706, at *12 (N.D. Calif. Sept. 13, 2021) (stating that the differences in the regulatory and transparency features between mutual funds and CITs make comparing the two types of funds difficult).

[34] *Matney*, 80 F.4th at 1153.

[35] *Id.*

[36] *Id.*

comparison presents a factual issue not to be decided at this [motion to dismiss] stage."[37] Thus, Plaintiffs' allegations regarding comparable CIT funds survive Defendants' motion to dismiss.

> ### c.     Single Asset Class Investment Options

Plaintiffs also allege that Defendants breached their fiduciary duty of prudence by including high-cost, single asset class investment options that cost more than the substantially same alternative options. Specifically, Plaintiffs compare three single asset class investment options to five alternative lower-cost investment options.[38] Plaintiffs contend that the five alternative investment options were lower-cost and performed better than, and in some cases, substantially better than the comparable higher-cost single asset class funds in the DI Plan.

Plaintiffs identified the alternative funds by using an "industry recognized software program that uses quantitative methods, such as returns-based and holdings-based correlation analysis, to find funds that are highly similar to the fund being analyzed . . . ." Plaintiffs allege that Morningstar Category classifications also support the comparison of the funds identified by the software program.[39] Specifically, they contend that the comparator funds fall into the same Morningstar Categories. And because the funds fall into the same categories, the alternative investment options have similar investment strategies, similar investment objectives, and similar risk profiles to the DI Plan funds.

---

[37] *Anderson v. Coca-Cola Bottlers' Ass'n*, 2022 WL 951218, at *10 (D. Kan. Mar. 30, 2022) (considering a breach of fiduciary duty of prudence claim relating to T. Rowe Price mutual fund TDFs and T. Rowe Price CIT-based TDFs).

[38] Plaintiffs identify the three single class investments as the (1) T. Rowe Price Growth Stock Fund; (2) Vanguard Institutional Index I; and (3) T. Rowe Price Equity Income Fund. The five alternative funds are the (1) TIAA-CREF Large-Cap Growth Index Institutional Fund; (2) Vanguard Mega Cap Growth Index Institutional Fund; (3) Fidelity 500 Index; (4) Vanguard S&P 500 Value Index Institutional; and (5) Vanguard Windsor Fund Admiral.

[39] The TAC alleges that Morningstar is a billion-dollar company with more than 10,000 employees globally, and Morningstar developed Morningstar Category Classifications in 1996 for the purpose of helping investors make meaningful comparisons between mutual funds.

Defendants assert five different reasons as to why Plaintiffs' allegations fail to state a plausible claim for breach of the duty of prudence as to these funds including that Plaintiffs: (1) fail to address dispositive fund differences with factual allegations to support a "meaningful benchmark" analysis; (2) improperly compare dissimilar actively managed funds with passively managed funds; (3) improperly compare dissimilar active funds; (4) improperly compare dissimilar index funds; and (5) software-suggested similarity of the funds and Morningstar categories do not translate to a "meaningful benchmark." Essentially, Defendants contend that the alternative funds are too dissimilar to the identified funds to be appropriate comparators, and thus Plaintiffs fail to state a claim.

The Court will address Defendants' first and fifth contentions together. First, Plaintiffs' TAC contains sufficient factual allegations to support fund comparisons. Plaintiffs identify the comparable funds by alleging that a software program identified the alternative funds, and the software program used a returns-based and holdings-based correlation analysis to find highly similar funds. Defendants assert that without facts establishing a correlation between fund holdings, "holdings-based" information is insufficient for a meaningful comparison. In addition, Defendants argue that "returns-based correlations" is an outcome-based comparison that was rejected by the Tenth Circuit in *Matney*. Here, Plaintiffs do not simply state that there are alternative funds, but rather they specifically name the software-identified alternative funds. Furthermore, Plaintiffs allege that the alternative funds fall into the same Morningstar categories.[40] Several courts "have accepted reliance on Morningstar categories as a meaningful benchmark to

---

[40] Plaintiffs allege that Morningstar is a billion-dollar company that developed classifications, or Morningstar Categories, for the purpose of helping "investors make meaningful comparisons between mutual funds." TAC, Doc. 65 at ¶ 228 (citation omitted).

make comparisons at the pleading stage."[41] Thus, Plaintiffs support their fund comparisons with factual allegations. The more pertinent question is whether Plaintiffs include sufficient allegations that the alternative funds are *proper* comparators, which is what Defendants contend in their other three arguments.

As to Defendants' second contention, they assert that Plaintiffs improperly compare active funds with passively managed funds. Two of the three specified imprudent single asset class funds identified by Plaintiffs in the TAC are actively managed funds.[42] Plaintiffs compare one of the actively managed funds with two passively managed funds,[43] and Plaintiffs compare the other actively managed fund with a passively managed fund and an actively managed fund.[44]

Defendants assert that the actively managed funds cannot be meaningfully compared to the passively managed funds because they are fundamentally different. Generally, passively managed funds are less expensive than actively managed funds because actively managed funds require active management.[45] "By contrast, passively managed funds create 'a fixed portfolio structured to match the overall market or a preselected part of it' and 'require little to no judgment.'"[46] Pursuant to the Tenth Circuit's statement in *Matney*, "[a]bsent facts alleging the better performing

---

[41] *Miller v. Packaging Corp. of Am., Inc.*, 2023 WL 2705818, at *10 (W.D. Mich. Mar. 30, 2023) (citing and collecting cases); *but see Riley v. Olin Corp.*, 2023 WL 371872, at *4 (E.D. Mo. Jan. 24, 2023) (noting that "[t]he Eighth Circuit has not upheld the use of Morningstar categories as an indicator of a meaningful benchmark" at the pleading stage).

[42] The T. Rowe Price Growth Stock Fund and the T. Rowe Price Equity Income Fund are actively managed funds.

[43] Plaintiffs compare the actively managed T. Rowe Price Growth Stock Fund with the passively managed (1) TIAA-CREF Large Cap Growth Index Institutional Fund; and (2) Vanguard Mega Cap Growth Index Institutional Fund.

[44] Plaintiffs compare the actively managed T. Rowe Price Equity Income Fund with (1) the passively managed Vanguard Windsor Fund Admiral; and (2) the actively managed Vanguard S&P Value Index Institutional Fund.

[45] *Matney*, 80 F.4th at 1150, n.10 (citing *CommonSpirit Health*, 37 F.4th at 1163).

[46] *Id.*

actively and passively managed funds are similar enough to the Plan's funds, the complaint fails to supply a meaningful benchmark for comparison."[47] To establish a meaningful benchmark, a plaintiff "must do the work of showing that the comparator investment has sufficient parallels to prove a breach of fiduciary duty."[48] As noted above, specific facts would include allegations that the funds had similar investment strategies, similar investment objectives, or similar risk profiles.[49] If "each fund has distinct goals and distinct strategies," a side-by-side comparison is unhelpful for determining which is the more prudent choice.[50] "A court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists; rather, the complaint must state facts to show the funds or services being compared are, indeed, comparable."[51]

Defendants direct the Court to the funds' prospectuses demonstrating that these active and passive funds are not comparable. Indeed, Defendants show that Plaintiffs compare one of the actively managed, non-diversified funds with two passively managed, diversified funds. In addition, the two passive funds track entirely different indexes.[52] Furthermore, Defendants contend that Plaintiffs make an inappropriate comparison of the other actively managed fund (that focuses on large-cap value stocks in both the United States and abroad) to a passively managed fund (that focuses on large-cap value companies only in the United States) that tracks a different index.[53]

---

[47] *Id.* at 1154.

[48] *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022) (citing *CommonSpirit Health*, 37 F.4th at 1167).

[49] *Matney*, 80 F.4th at 1148.

[50] *Id.* at 1154 (quoting *CommonSpirit Health*, 37 F.4th at 1167).

[51] *Id.* at 1149.

[52] The TIAA-CREF Fund tracks the Russell 1000 Growth Index, and the Vanguard Mega Cap Growth Index tracks the CRSP U.S. Mega Cap Growth Index.

[53] Plaintiffs compare the active T. Rowe Price Equity Income Fund with the Vanguard S&P 500 Value Index Fund that tracks the S&P Value Index.

Plaintiffs' response does not direct the Court to specific allegations in the TAC refuting Defendants' arguments. Instead, Plaintiffs direct the Court to generalities that the funds are similar. Yet, the funds prospectuses demonstrate that the proposed alternative funds' investment strategies, objectives, and risk profiles are vastly different. Because the funds' goals and strategies are distinct, this comparison is unhelpful.[54] Due to the differences between these actively and passively managed funds both in their investment strategies and investment holdings, Plaintiffs' TAC contains insufficient allegations to support a meaningful comparison of these actively managed funds to passively managed funds.

Thirdly, Defendants assert that Plaintiffs compare an active fund with a dissimilar active fund. Although both funds are actively managed, Defendants contend that the funds have a differing mix of assets making them inappropriate to meaningfully compare.[55] Yet, Defendants' assertion is not entirely supported by the prospectus. The Court is not convinced at this stage that it can make the determination that these two actively managed funds are not similar enough to provide a meaningful benchmark.[56]

As to Defendants' final argument, they argue that the third single asset investment option in the DI Plan identified by Plaintiffs, an index fund, is improperly compared to an alternative index fund. Defendants contend that the two index funds have different investment strategies.[57] Plaintiffs counter Defendants' argument by contending that the two funds have similar investment

---

[54] *Matney*, 80 F.4th at 1154.

[55] Plaintiffs compare the T. Rowe Price Equity Income Fund with the Vanguard Windsor Fund Admiral.

[56] The Court notes that "identical" is not the measure but rather "similar" is the measure. *See Matney*, 80 F.4th at 1148 (stating that a "meaningful comparison" may be supported by facts alleging that "the alternative investment options have similar investment strategies, similar investment objectives, or similar risk profiles to the plan's funds.").

[57] Plaintiffs compare the Vanguard Institutional Index Fund with the Fidelity 500 Index Fund.

strategies and that both funds track the same index.[58] Furthermore, Plaintiffs assert that Defendants (belatedly) transferred Plaintiff Middleton's investment in the allegedly imprudent index fund to the alternative index fund which further demonstrates similarity between the two index funds.[59] Thus, because there are allegations that the two funds have similar investment strategies, track the same index, and Plaintiff Middleton's investment was transferred into the alternative index fund, the Court concludes that Plaintiffs sufficiently allege a meaningful benchmark as to this investment option.

In sum, as to the single asset class investment options, Plaintiffs fail to adequately allege a meaningful benchmark for the actively managed and passively managed funds. The Court, however, concludes that there are sufficient allegations as to the remainder of this claim, which includes the actively managed fund compared to another actively managed fund, and the index fund.

           d.        Index Funds

In the fourth category of investment funds, Plaintiffs allege that certain index funds should have been replaced with other index funds. The Court already discussed one of these index funds above and found sufficient allegations of a meaningful benchmark.[60] Plaintiffs also identify two additional index funds that they contend should have been replaced with other index funds.[61] Defendants primarily assert that it appears that the alternative index funds are CITs, and because

---

[58] They track the S&P Index.

[59] Plaintiffs allege that Middleton's investment in the Vanguard Institutional Index Fund was transferred to the Fidelity 500 Index Fund.

[60] This fund was the Vanguard Institutional Index Fund as compared to the Fidelity 500 Index.

[61] Plaintiffs allege that the (1) Vanguard Institutional Index I (VINIX) should have been replaced with the State Street S&P 500 Index II; and (2) the Vanguard Total Bond Market Index I (VBTIX) should have been replaced with the State Street U.S. Bond Index Fund.

there are differences between mutual funds and CITs, this theory of imprudence fails. Yet, Plaintiffs' TAC does not contain allegations that the comparator funds are CITs, and Defendants do not direct the Court to any documents or other judicially noticed facts to support their contention that the comparators are CIT funds.[62] Thus, Defendants' contention is not supported. Furthermore, Plaintiffs allege that the lower-cost alternative index options have similar, if not the same, investment strategies, investment objectives, and risk profiles. Accordingly, there are sufficient allegations that these funds are an appropriate benchmark.

> e.      Summary

Of the four categories of investments at issue (lower-cost share class versions, CIT funds, single asset class investment options, and index funds), most of them remain. The only exception is the actively managed funds versus the passively managed funds in the single asset class investment option. Plaintiffs' breach of fiduciary duty claim related to this type of investment is dismissed. Otherwise, the Court denies Defendants' Motion as to Plaintiffs' breach of fiduciary duty of prudence claim as to the DI Plan.

> 2.      *Amentum Plan (Count II)*

Plaintiffs allege that Defendants breached their fiduciary duties to the Legacy Amentum Plan, the Post-Merger Amentum Plan, and their participants by failing to engage in a prudent process to select, monitor, retain, and remove investment options.[63] With regard to the Amentum Plan, there are two different timeframes due to the merging of the DI Plan into the Amentum Plan on December 31, 2021. As noted above, the Court refers to the plan prior to the merger as the

---

[62] As noted above, CIT funds can sometimes provide a meaningful benchmark.

[63] Similar to the DI Plan, Plaintiffs also alleged that Defendants breached their fiduciary duty of prudence by failing to engage in a reasoned and impartial decision-making process with regard to the use of forfeited funds. This part of the claim will be discussed below.

Legacy Amentum Plan. Post merger, the Court refers to the plan as the Post-Merger Amentum Plan.

        a.        Legacy Amentum Plan

As an initial matter, the Court must set forth the relevant timeframe and background facts. Plaintiffs allege that the Legacy Amentum Plan was previously known as the AECOM SCE 401(k) Retirement Plan for Specified Contract Employees ("AECOM Plan"). As of December 31, 2019, the AECOM Plan only had $322 million in assets. AECOM Global, however, aggregated all its retirement plans' assets in a master trust, so AECOM Plan participants had access to an ultra-low-cost Vanguard CIT TDF. Around February 1, 2020, the AECOM Plan was spun off due to a company sale, separated from the master trust, and renamed the (Legacy) Amentum Plan. Amentum Parent Holdings, LLC, became the new plan sponsor and administrator.

Defendants argue that Plaintiffs do not plausibly allege that the spun-off Legacy Amentum Plan qualified for the lower cost Vanguard CIT TDF. In addition, Defendants contend that because the Legacy Amentum Plan was only briefly in existence, and the alleged imprudence only relates to 2021 with replacements being made in 2022, this short period of expense data and lack of facts on performance is insufficient to plausibly suggest imprudence.[64] Yet, Plaintiffs allege that when the plan was spun off, Defendants knew or had reason to know that the assets were invested in low-cost Vanguard CIT TDFs. And Plaintiffs allege that despite knowing of the Vanguard CIT TDFs, Defendants chose the higher-priced Vanguard mutual fund TDFs. Furthermore, Plaintiffs allege that there were over $500 million in assets in the Vanguard Target Date strategy in 2020

---

[64] Unlike the DI investments, Defendants do not discuss whether Plaintiffs identify meaningful benchmarks as to the investments in the Legacy Amentum Plan.

which would have qualified the Legacy Amentum Plan for the Vanguard CIT version. Thus, the Court concludes that there are sufficient allegations to state a claim.

        b.        Post-Merger Amentum Plan

Plaintiffs allege that Defendants breached their duty of prudence to the Post-Merger Amentum Plan by (1) allowing imprudent DI Plan investments to migrate to the plan; (2) failing to replace a mutual-fund-based product with a substantially identical CIT-based version; and (3) failing to take advantage of lower-cost share class options that were already offered in the Amentum Plan.

Defendants first argue that because Plaintiffs' allegations in Count I fail to establish a breach of the duty of prudence with regard to the DI Plan prior to the merger, the Post-Merger Amentum Plan cannot be liable based on the same deficient allegations. Plaintiffs' claims, however, as to certain investments in the DI Plan, did not previously fail. Thus, Defendants' argument does not have merit.

Next, Defendants contend that post-merger, the Amentum parties made the changes advocated by Plaintiffs by the end of 2022. Defendants direct the Court to the post-merger 2022 Form 5500 for support.[65] From this document, however, the Court cannot conclude that the changes were made and/or when they were made.[66] Furthermore, it appears that there are factual issues as to whether Defendants were prudently monitoring the Post-Merger Amentum Plan. Thus, it must deny Defendants' Motion on this basis.

---

[65] A Form 5500 is an annual report that includes information about the plan's financial conditions and investments.

[66] Defendants do not explain to the Court how to interpret the Form 5500. Instead, they direct the Court to one page of the 47-page document that lists approximately 50 investment funds. Presumably, these are the investments that the Post-Merger Amentum Plan held at the end of 2022, but the Court declines to engage in conjecture.

Finally, Defendants argue that Plaintiffs' claim fails as to the identification of an additional 10 mutual funds in the Post-Merger Amentum Plan. Plaintiffs include a graph of 10 funds that they contend Amentum should have replaced with substantially identical, lower-cost counterparts.[67] Defendants contend that even assuming the expense ratios for the "cherry-picked" year of 2021 was representative of the investment menu for all other times in the class period, almost all the funds that Plaintiffs complain about in 2021 were removed in 2022 from the Post-Merger Amentum Plan. Again, Defendants direct the Court to the post-merger 2022 Form 5500 to support this contention. As noted above, however, the Court cannot rely on this document as a basis for dismissal, and there appear to be factual questions related to the monitoring of these investments.

Accordingly, the Court denies Defendants' Motion relating to the Amentum investment claims.

**B.     Forfeiture Claims (I, II, V, VI, VII, VIII, IX, X)**

The following allegations are taken from Plaintiffs' TAC. The assets of the DI Plan and the Amentum Plan are held in trust, and both plans are funded by a combination of wage contributions from employees and company contributions. These contributions become plan assets when they are contributed to the trust. Each participant in the plan is charged with an allocation of plan expenses. To pay these administrative expenses, they are either paid directly from the participant's account or indirectly through investment fees. Administrative fees may be reduced in different ways. If a plan has forfeitures, the plan fiduciaries may use those forfeitures to pay plan expenses. Forfeitures occur when contributions are made to a participant's account, but the participant terminates employment before becoming fully vested.

---

[67] Unlike the DI investments, Defendants do not discuss in their motion whether Plaintiffs identify meaningful benchmarks as to the investments in the Post-Merger Amentum Plan.

In the DI Plan, certain contributions required three years of qualified service. Plaintiffs allege that the DI Plan trust had forfeitures that it could have used to pay administrative expenses. They claim that the fiduciaries elected to use over $2 million of forfeited plan assets from 2017 through 2021 to reduce DI's company contribution. Plaintiffs contend that the use of these forfeitures saved DI over $2 million dollars, and it increased the amount of expenses paid by participants by at least $1.185 million in direct expenses from 2017 to 2021 and in excess of $400,000 in indirect expenses from 2019 through 2021.

In the Amentum Plan,[68] Plaintiffs allege that there were forfeitures in both 2021 and 2022 that could have been used to pay administrative expenses. They contend that the Amentum Plan elected to use over $870,000 of forfeited plan assets from 2021 through 2022 to reduce their company contributions. Plaintiffs allege that the use of these forfeitures saved Amentum over $870,000, and it increased the amount of expenses paid by participants out of plan assets by over $800,000 in direct expenses.

    1.    *Breach of Fiduciary Duty of Prudence (Counts I and II) and Breach of Fiduciary Duty of Loyalty (Counts V and VI)*

Plaintiffs allege that Defendants breached their fiduciary duties of prudence and loyalty by applying forfeitures to reduce Defendants' contributions to the Amentum and DI Plans rather than applying forfeitures to reduce Plaintiffs' administrative expenses. As to the alleged breach of fiduciary duty of prudence, Plaintiffs contend that Defendants failed to engage in a reasoned and impartial decision-making process to determine that using forfeited funds to reduce their contribution expenses, as opposed to administrative expenses, was in the best interest of the Plans'

---

[68] Plaintiffs do not differentiate between the Legacy and/or the Post-Merger Amentum Plan in these allegations. The Legacy Amentum Plan was in effect in 2021, and the Post-Merger Amentum Plan was in effect in 2022.

participants. As to the alleged breach of fiduciary duty of loyalty, Plaintiffs assert that Defendants breached this duty by choosing to utilize forfeited funds in the Plans for the benefit of Defendants rather that solely in the interest of the participants and beneficiaries.

Defendants seek dismissal of these claims by first arguing that Plaintiffs challenge non-fiduciary acts. In addition, Defendants contend that even assuming Plaintiffs allege a fiduciary function, Plaintiffs do not plead a breach of either the duty of loyalty or duty of prudence. The Court will address each contention in turn.

a.      Fiduciary Act

Defendants first argue that Plaintiffs' fiduciary duty claims as related to the use of forfeited funds fail because Plaintiffs challenge non-fiduciary acts. "In every case charging breach of ERISA fiduciary duty, [], the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."[69] "In defining the scope of fiduciary duties under ERISA, courts have drawn a distinction between actions taken as a fiduciary and actions taken as a settlor."[70] "Fiduciary duties 'consist of such actions as the administration of the plan's assets.'"[71] In contrast, "[s]ettlor duties include decisions 'regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated.'"[72]

Here, the terms of the Plans expressly permit forfeitures to be used as company contributions or as payment of administrative expenses.[73] Indeed, the Plans do not dictate any order

---

[69] *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

[70] *Hutchins v. HP Inc.*, 737 F. Supp. 3d 851, 860 (N.D. Cal. 2024) ("*Hutchins I*").

[71] *Id.* (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999)).

[72] *Id.* (quoting *Hughes*, 525 U.S. at 444).

[73] As noted above, Defendants attached documents to their Motion to Dismiss, including excerpts of the DI and Amentum Plans (Exhibits 25 through 29). The plan language addressing the use of forfeitures can be found at

of priority of forfeited funds. Defendants contend that the thrust of Plaintiffs' forfeiture claims is that Defendants had no discretion regarding how to use the forfeitures because those funds must always be used to first pay for administrative expenses rather than to pay for company contributions. Thus, Defendants contend that would result in a *de facto* redesign of the plans.

In *Hutchins v. HP Inc.*, the Northern District of California recently considered a similar challenge.[74] The plaintiff sought to bring a purported class action presenting the "novel question" of "[w]hether and under what circumstances is a plan administrator's decision to use 'forfeited' employer contributions to a retirement plan to reduce employer contributions rather than to pay administrative costs a violation of . . . ERISA?"[75] The plaintiff alleged that the defendants breached their fiduciary duty of loyalty and prudence "when they chose to allocate forfeited amounts to reduce employer contributions rather than to pay administrative expenses."[76]

The defendants in *Hutchins* made a similar argument to the one Defendants make here. Specifically, the defendants asserted that the plaintiff was challenging a settlor decision, rather than a fiduciary decision, "in deciding whether to allocate forfeited amounts to reduce employer contributions as opposed to paying Plan expenses."[77] The court, however, found that "the decision to allocate forfeited amounts is a fiduciary, as opposed to a settlor, function."[78] Specifically, the

---

Doc. 72-25 at 27, ¶ 9.2(c) (DI Plan 2014); Doc. 72-26 at 28, ¶ 9.2(c) (DI Plan 2018); Doc. 72-27 at 40, ¶ 9.3 (AECOM Plan 2018); Doc. 72-28 at 30, ¶ 9.5(b) (Amentum Plan October 2022); and Doc. 72-29 at 34, ¶ 9.5(b) (Amentum Plan December 2022). The plans have similar language in that they all allow for the use of forfeitures to reduce company contributions or to pay plan fees and expenses, among other things.

[74] *Hutchins*, 737 F.3d at 860–61. There are two *Hutchins* decisions. The first decision found that the plaintiff failed to state a claim, but the court allowed the plaintiff to amend the complaint to narrow down the allegations. *Id.* at 864. The second decision found that, even after narrowing the allegations, the plaintiff still failed to state a claim. *Hutchins v. HP Inc.*, 767 F. Supp. 3d 912 (2025) ("*Hutchins II*"). The Court will discuss both orders in this decision.

[75] *Hutchins I*, 737 F. Supp. 3d at 856.

[76] *Id.* at 862.

[77] *Id.* at 860.

[78] *Id.*

court noted that the plaintiffs were not challenging the terms of the plan but rather challenging the "[d]efendants' selection of one of the options under [the Plan.]"[79] Thus, the court found that the plaintiff "met the threshold requirement of alleging that Defendants acted as fiduciaries when they determined how to allocate forfeited amounts."[80]

In this case, similar to *Hutchins*, Plaintiffs do not challenge the plan language but instead challenge "Defendants' selection of one of the options under" the Plan language.[81] Thus, "Plaintiff[s] attack[] not the *decision* to include [the plan provision] as a Plan term, but Defendants' *implementation* of that decision—that is, Defendants exercised discretion and control over Plan assets and thus were making decisions of Plan administration rather than Plan design."[82] In other words, Plaintiffs challenge Defendants' choice of the options presented in the plan. Accordingly, the Court finds that Plaintiffs are challenging a fiduciary act.

>    b.    Whether Plaintiffs State a Claim

Defendants next argue that even if Plaintiffs allege a fiduciary function, Plaintiffs fail to state a claim for breach of the fiduciary duty of loyalty or prudence. ERISA's fiduciary duty of loyalty requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan."[83] And, as noted above, the duty of prudence requires a fiduciary to act "with the care, skill, prudence, and

---

[79] *Id.*; *see also Dimou v. Thermo Fisher Sci. Inc.*, 2024 WL 4508450, at *8 (S.D. Cal. Sept. 19, 2024) (relying on *Hutchins I* and finding that the plaintiff's claims as to how the defendant used forfeitures implicated a fiduciary decision and not a settlor decision).

[80] *Hutchins I*, 737 F. Supp. 3d at 861.

[81] *Id.*

[82] *Id.*

[83] 29 U.S.C. § 1104(a)(1)(A).

diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[84]

Plaintiffs' theory that Defendants breached their fiduciary duties of loyalty and prudence by using forfeited funds as matching contributions instead of using them to pay administrative expenses is a relatively new theory.[85] Several recent decisions, primarily from district courts within the Ninth Circuit, have dismissed these types of breach of fiduciary claims.[86] Defendants assert that the Court should follow this recent caselaw because (1) the use of forfeitures satisfied ERISA's fiduciary mandates; (2) Plaintiffs impermissibly seek to create a new benefit, not remedy the breach of a fiduciary duty; and (3) these claims flout established law. The Court agrees.

"ERISA does not create an exclusive duty to maximize pecuniary benefits."[87] Indeed, "[n]othing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kinds of benefits employers must provide if they choose to have such a plan."[88]

---

[84] *Id.* § 1104(a)(1)(B).

[85] *See Sievert v. Knight-Swift Transp. Holdings, Inc.*, --- F. Supp. 3d ---, 2025 WL 1248922, at *3 (D. Ariz. Apr. 30, 2025) (noting that since the fall of 2023, "more than 30 putative class action lawsuits have been filed alleging that the use of forfeitures to offset employer contributions violates ERISA.").

[86] *See Hutchins II*, 767 F. Supp. 3d at 921–28; *Sievert*, 2025 WL 1248922, at *3–5; *Hutchins I*, 737 F. Supp. 3d at 860–64; *Dimou*, 2024 WL 4508450, at *8–9. *See also Barragan v. Honeywell Int'l Inc.*, 2024 WL 5165330, at *4–5 (D.N.J. Dec. 19, 2024) (finding *Hutchins I* persuasive and dismissing without prejudice the plaintiff's claims for breach of fiduciary duty of loyalty and prudence related to forfeited amounts in the plan).

[87] *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1100 (9th Cir. 2004) (quotation marks and citation omitted); *see also Rozo v. Principal Life Ins. Co.*, 48 F.4th 589, 598 (8th Cir. 2022) (stating that it agrees with the Ninth Circuit that "ERISA does not create an exclusive duty to maximize pecuniary benefits.") (citation omitted); *Ershick v. United Missouri Bank of Kansas City, N.A.*, 1990 WL 126929, at *4 (D. Kan. Aug. 28, 1990) (stating that "§ 404 ERISA creates no exclusive duty of maximizing pecuniary benefits.") (citations omitted).

[88] *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (citations omitted); *see also Matney*, 80 F.4th at 1145 (noting that the enactment of ERISA "did not require employers to establish benefit plans in the first place.") (citation omitted).

"ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits."[89]

Under ERISA, a fiduciary's duties are primarily found "in the terms of the plan itself."[90] "[T]he fiduciary duty is fulfilled where the fiduciary ensures that participants have received their promised benefits."[91] "[W]here the terms of an ERISA plan comply with the law, the plan fiduciary is not authorized to provide Plan participants with *more* benefits than the Plan documents set out."[92]

In this case, Plaintiffs do not allege that Defendants violated the Plans' terms. Indeed, the Plans' terms explicitly allow for the use of forfeited funds as company contributions or administrative expenses.[93] The Plan language also does not dictate an order of priority. If the Court were to adopt Plaintiffs' theory, it would effectively create the benefit of paying Plaintiffs' administrative costs.

Furthermore, as the *Hutchins* court noted, Plaintiffs' "theory of liability is contrary to the settled understanding of Congress and the Treasury Department regarding defined contribution plans."[94] Specifically, "[t]he Treasury Department and Congress have long understood that forfeitures in defined contribution plans 'could be reallocated to the remaining participants under a nondiscriminatory formula, used to reduce future employer contributions, or used to offset

---

[89] *Lockheed Corp.*, 517 U.S. at 887.

[90] *Foltz v. U.S. News & World Rep., Inc.*, 865 F.2d 364, 373 (D.C. Cir. 1989) (citing *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511 (1981)).

[91] *Hutchins II*, 767 F. Supp. 3d at 924 (citing *Foltz*, 865 F.2d at 373).

[92] *Id.* at 925 (citing *Foltz*, 865 F.2d at 373) (further citations omitted).

[93] Doc. 72-25 at 27, ¶ 9.2(c); Doc. 72-26 at 28, ¶ 9.2(c); Doc. 72-27 at 40, ¶ 9.3; Doc. 72-28 at 30, ¶ 9.5(b); Doc. 72-29 at 34, ¶ 9.5(b).

[94] *Hutchins I*, 737 F. Supp. 3d at 863.

administrative expenses of the plan.'"[95] Plaintiffs' theory of liability "would contravene decades of federal regulations suggesting that using forfeitures to reduce employer contributions is entirely permissible, and [it] would necessarily 'create benefits beyond what was promised in the Plan itself.'"[96] Thus, Plaintiffs impermissibly seek to create a new benefit, and they fail to state a claim that Defendants' use of forfeitures violated ERISA's fiduciary mandates. Accordingly, Plaintiffs' breach of fiduciary duty claims as related to the use of forfeitures (Counts I, II, V, and VI) fail and are dismissed.

### 2.    *Prohibited Transactions Claims (Counts VII and VIII)*

Plaintiffs allege that Defendants' decision to use forfeited funds as a substitute for future employer contributions to the Plan were prohibited transactions. Defendants argue that Plaintiffs' claims fail because (1) Defendants were acting in a settlor capacity when using the forfeited funds, and (2) the allegations do not constitute a "transaction." The Court already determined that this conduct was fiduciary in nature and thus will only address whether Plaintiffs adequately allege that the use of the forfeited funds were prohibited transactions.

---

[95] *Id.* (quoting Use of Forfeitures in Qualified Retirement Plans, 2023 WL 2213890, 88 Fed. Reg. 12282-01, at 12283).

[96] *Wright v. JPMorgan Chase & Co.*, 2025 WL 1683642, at *5 (C.D. Cal. June 13, 2025) (quoting *Hutchins II*, 767 F. Supp. 3d at 923); *see also Sievert*, 2025 WL 1248922, at *4 (noting the *Hutchins* court's discussion of treasury regulations and stating that it was "more persuaded by the reasoning of the *Hutchins* court, which recently dismissed an amended class action complaint alleging similar violations of ERISA on a forfeiture allocation theory"); *Dimou*, 2024 WL 4508450, at *9 (finding that the plaintiff's fiduciary liability claim regarding the use of forfeitures mirrored the claim asserted in *Hutchins* and was "too broad to be plausible"); *Barragan*, 2024 WL 5165330, at *4–5 (finding *Hutchins I* persuasive and dismissing the plaintiff's breach of the duty of loyalty and duty of prudence claims).

The Court is aware of several district court decisions denying motions to dismiss in forfeiture-based cases. *See Wright*, 2025 WL 1683642, at *5 (citing *Rodriguez v. Intuit Inc.*, 744 F. Supp. 3d 935 (N.D. Cal. 2024); *Perez-Cruet v. Qualcomm Inc.*, 2024 WL 3702207 (S.D. Cal. May 24, 2024); *McManus v. Clorox Co. ("McManus II")*, 2025 WL 732087 (N.D. Cal. Mar. 3, 2025)). However, as the *Wright* court noted, "[t]he theories addressed in *Intuit* and *Qualcomm* are meaningfully different from that advanced here, as the plaintiffs there alleged that the defendants' use of forfeitures violated the express terms of the plans at issue." *Wright*, 2025 WL 1683642, at *5. There are no allegations here that the use of forfeitures violated the Plans' express terms. Furthermore, although the *McManus* court allowed the claims to go forward, the Court finds more persuasive the other authority cited above.

"[Section] 406 of ERISA prohibits fiduciaries from involving the plan and its assets in certain kinds of business deals."[97] Specifically, as relevant here, 29 U.S.C. § 1106(a)(1)(A) provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest."[98] In addition, § 1106(b) prohibits "[t]ransactions between plan and fiduciary" when the fiduciary "deal[s] with the assets of the plan in his own interest or for his own account."[99]

In *Lockheed Corporation v. Spink*, the United States Supreme Court found that the type of transactions contemplated under § 1106(a)(1) are "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length."[100] "What the 'transactions' identified in § 406(a) thus have in common is that they generally involve uses of plan assets that are potentially harmful to the plan."[101] "Congress enacted § 406 'to bar categorically a transaction that [is] likely to injure the pension plan.'"[102]

Several recent court decisions have found that the type of allegations raised in this case—electing to use forfeited funds as a substitute for future employer contributions to the Plan—do not rise to the level of prohibited transactions. In *Hutchins I*, the court found that "Plaintiff's allegations show that forfeited amounts remain Plan assets and are merely reallocated to provide pension benefits to other employees through use as matching contributions."[103] Thus, the court

---

[97] *Lockheed Corp.*, 517 U.S. at 888 (citing 29 U.S.C. § 1106)).

[98] 29 U.S.C. § 1106(a)(1)(A).

[99] 29 U.S.C. § 1106(b)(1).

[100] *Lockheed Corp.*, 517 U.S. at 893.

[101] *Id.*

[102] *Id.* at 888 (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)).

[103] 737 F. Supp. 3d at 868.

concluded that the transactions were not prohibited.[104] Similarly, in *Dimou v. Thermo Fisher Scientific Inc.*, the court relied on *Hutchins I* and found that the plaintiffs' allegations that the defendants' reallocation of forfeitures was an intra-plan transaction and not a prohibited transaction under § 1106(a) or (b), and thus the plaintiff failed to state a claim.[105]

The Court finds this reasoning persuasive. Here, Plaintiffs conclusorily state that the transactions—using forfeited funds as a substitute for future employer contributions—were prohibited and harmful to the Plan because it increased the expenses plan beneficiaries must pay. Yet, Plaintiffs' allegations demonstrate that the forfeited funds remained in the Plans. Thus, there are no allegations that the Plans were injured, harmed, or underfunded. Accordingly, the Court finds that Plaintiffs fail to state a claim (Counts VII and VIII) for prohibited transactions.

### 3.    *ERISA's Anti-Inurement Provision Claims (Counts IX and X)*

Plaintiffs allege in these claims that Defendants' use of forfeitures as employer contributions caused the assets of the Plans to inure to the benefit of DI and Amentum. Defendants argue that Plaintiffs fail to state a claim because (1) the conduct alleged is not fiduciary in nature, (2) there are no allegations of removal or diversion of assets from the Plans, and (3) even if reducing employer contribution costs provided an "incidental" benefit to Defendants, it did not violate ERISA's anti-inurement provision. The Court already found that this conduct was fiduciary in nature so it will only address Defendants' second and third arguments.

---

[104] *Id.*

[105] 2024 WL 4508450 at *11; *Barragan*, 2024 WL 5165330, at *6–7 (finding that the complaint failed to plausibly allege a prohibited transaction claim because "the allegations demonstrate that the forfeited amounts remain as Plan assets and are reallocated to other Plan participants."). *But see Rodriguez v. Intuit Inc.*, 744 F. Supp. 3d 935, 949 (N.D. Cal. 2024) (finding that the defendant's reallocation of plan assets to reduce its own matching contributions "was a 'use' of plan assets for the purposes of § 1106(a)(1) [and] . . . a 'dealing with' plan assets for the purposes of § 1106(b)(1).").

Subject to certain enumerated exceptions, ERISA's anti-inurement provision, § 403(c)(1), states that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."[106] "The purpose of the anti-inurement provision . . . is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others."[107] "The anti-inurement or 'exclusive benefit' policy of section 403(c) of ERISA is intended to 'protect participants' expected payments' by preventing employers from diverting funds to themselves."[108] Generally, "allegations of 'indirect' benefits inuring to an employer are insufficient to state an anti-inurement claim under Section 403(c)(1)."[109] Furthermore, "[s]ection 403(c)(1) claims typically involve allegations of improper 'reversion [or] diversion' of plan assets to the employer."[110]

There are several recent decisions in which courts have dismissed anti-inurement claims when there are no allegations of reversion or diversion of Plan assets, and there is only the allegation of an incidental benefit.[111] As the *Hutchins I* court noted, a decision to use forfeited funds to supply a company's matching contributions

---

[106] 29 U.S.C. § 1103(c)(1).

[107] *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004).

[108] *Maez v. Mtn. States Tel. & Tel., Inc.*, 54 F.3d 1488, 1506 (10th Cir. 1995) (citation omitted).

[109] *Krohnengold v. New York Life Ins. Co.*, 2022 WL 3227812, at *10 (S.D.N.Y. Aug. 10, 2022) (citing *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 88 (2nd Cir. 2001)).

[110] *Id.* (quoting *Maez*, 54 F.3d at 1506).

[111] *See Hutchins I*, 737 F. Supp. 3d at 867 (dismissing the plaintiff's anti-inurement claim because it found that the plaintiff's claim "that forfeited amounts inured to the benefit of [the defendant] is implausible"); *Barragan*, 2024 WL 5165330, at *5–6 (finding that because the plaintiff alleged that the forfeited amounts remained part of the plan assets and were utilized as a substitute for the company's own contributions, the plaintiff failed to state an anti-inurement claim); *McManus*, 2024 WL 4944363, at *7 (noting other decisions that held "that more than a benefit to employers is required to state an anti-inurement claim" and finding that the plaintiff failed to state an anti-inurement claim when the plaintiff simply alleged that the defendant reallocated forfeited funds within the same plan); *Dimou*,

is not a violation of the anti-inurement provision because the forfeited amounts are plan assets which do not leave the Plan trust fund and are used to pay pension benefits to Plan participants. The fact that [the company] benefits through the reduction in its future matching contributions does not make the use of forfeited amounts in this way a violation of the anti-inurement provision—the benefit that [the company] receives is incidental to the payment of pension benefits.[112]

Similarly, here, Plaintiffs do not allege that forfeitures were removed or diverted from the Plans. Instead, these forfeitures remained in the Plans, and Plaintiffs acknowledge that Defendants used the forfeitures to contribute to the Plans. Plaintiffs simply allege that because the forfeitures reduced the amount Defendants had to contribute, there was an incidental benefit to Defendants. Yet, the participants of the Plans still received the benefits. These types of allegations are insufficient to state a claim that Defendants violated ERISA's anti-inurement provision. Accordingly, the Court dismisses Plaintiffs' anti-inurement claims (Counts IX, X).

## C.    Failure to Monitor Claims (Counts III and IV)

In Count III, Plaintiffs allege that DI and Amentum (after its acquisition of DI in November 2020) appointed and had a duty to monitor the DI Committee to ensure that it was adequately performing its fiduciary obligations and to take prompt action to protect the plan if the relevant committee was not fulfilling those duties. In Count IV, Plaintiffs allege that Amentum appointed and had a duty to monitor ABAC; ABAC appointed and had a duty to monitor ARIC; and Amentum (as plan sponsor) had a duty to monitor ABAC and ARIC. Plaintiffs allege that all Amentum Defendants failed at their monitoring duties.

---

2024 WL 4508450, at *10 (finding that the plaintiff failed to state a plausible anti-inurement claim because he failed "to allege removal of plan assets for the benefit of anyone other than the Plan participants"). *But see Rodriguez*, 744 F. Supp. 3d at 947 (finding that the plaintiff stated an anti-inurement claim when the plaintiff alleged that the defendant used the plan assets to reduce its future matching contributions).

[112] *Hutchins I*, 737 F. Supp. 3d at 866 (internal citations omitted).

Defendants first argue that the failure to monitor claims in Counts III and IV are derivative of the underlying breach of fiduciary claims in Counts I, II, V, and VI.[113] Plaintiffs agree. Thus, to the extent Plaintiffs' failure to monitor claims relate to the underlying breach of fiduciary duty claims (prudence and loyalty) relating to the investment or forfeiture allegations that were dismissed, Plaintiffs' failure to monitor claims are dismissed.[114] Most of the underlying breach of fiduciary duty of prudence claims as they relate to investment allegations remain, however, and thus the Court will address Defendants' next argument.

Defendants next assert that Plaintiffs' failure to monitor claims are based on conclusory, unsupported allegations instead of based on facts alleging a deficient monitoring process. There is a duty under ERISA for fiduciaries to monitor other individuals that they appoint to make decisions about the plan.[115] "The duty to monitor requires that plan fiduciaries systematically consider all the investments . . . at regular intervals to ensure that they are appropriate."[116] "To state a claim for failure to monitor under ERISA, the plaintiff must allege that the defendant failed to review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards."[117]

---

[113] *See Matney*, 80 F.4th at 1159, n.21 (stating that the parties agreement that the duty to monitor claims rise or fall with the underlying duty of prudence and loyalty claims "reflect[] a consensus among the circuits that have passed on the issue.") (citations omitted).

[114] *See Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629 F. Supp. 3d 352, 367 (M.D.N.C. 2022) (stating that "the duty to monitor claim is only as broad as the surviving prudence claim and is otherwise dismissed.") (quotation marks and citations omitted).

[115] *See In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002, 1047 (S.D. Ohio 2006) (citing 29 C.F.R. § 2509.75-8).

[116] *Garnick*, 629 F. Supp. 3d at 367 (alterations and internal quotation marks omitted) (citing *Tibble*, 575 U.S. at 529).

[117] *Carter v. San Pasqual Fiduciary Trust Co.*, 2016 WL 6803768, at *5 (C.D. Cal. April 18, 2016) (quotation marks and citations omitted).

Plaintiffs allege that Defendants breached their fiduciary monitoring duties by (1) failing to monitor and evaluate the performance of the DI Committee, ABAC, or ARIC or have a system in place for doing so; (2) failing to monitor the processes by which the DI and Amentum Plan's investments were evaluated; and (3) failing to remove the DI Committee, ABAC, or ARIC as a fiduciary whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments in the DI or Amentum Plans. Although the allegations are brief, they are sufficient to state a claim for failure to monitor. Thus, the Court denies Defendants' Motion to Dismiss Plaintiffs' failure to monitor claim to the extent it relates to the underlying breach of fiduciary duty of prudence investment claims against DI and Amentum.

Finally, Defendants contend that Counts III and IV should be dismissed if they are asserted against Defendants other than Amentum, DI, the ABAC, and individual ABAC members. They argue that liability for failure to monitor attaches to the appointing fiduciary—not the appointee.[118] Thus, Defendants assert that neither ARIC nor its members, nor the DI Committee nor its members can be liable for failure to monitor themselves. Plaintiffs do not address Defendants' argument. Accordingly, based on Plaintiffs' lack of a response, and the regulation stating that the appointing fiduciary should review the performance of the fiduciaries, the Court dismisses Count III and IV if Plaintiffs assert those claims against any other Defendants than DI, Amentum, ABAC, and the individual ABAC members.

Accordingly, the Court grants in part and denies in part Defendants' request to dismiss the failure to monitor claims.

---

[118] *See* 29 C.F.R. § 2509.75-8 (stating that "[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.")

**D.     Leave to Amend**

Plaintiffs request, as alternative relief, leave to amend their complaint should the Court find their pleadings insufficient to state a claim. Plaintiffs initially filed their Complaint on October 10, 2023, and they are currently on their Third Amended Complaint.[119] Plaintiffs do not indicate how they would remedy any deficiencies and instead appear to seek an advisory ruling by the Court as to the shortcomings in their allegations. Plaintiffs also fail to provide the Court with a proposed pleading.[120] Thus, the Court denies Plaintiffs' request.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 71) is **DENIED IN PART** and **GRANTED IN PART**. Counts I and II are **dismissed in part**; Counts III and IV are **dismissed in part**; Counts V, VI, VII, VIII, IX, and X are **dismissed**.

**IT IS SO ORDERED.**

Dated this 5th day of August, 2025.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[119] Two of Plaintiff's amended complaints were filed after Defendants filed motions to dismiss.

[120] *See* D. Kan. Rule 15.1(a)(2) (stating that a party who requests leave to file a pleading must attach a proposed pleading).